[L. A. No. 29537. In Bank. Feb. 7, 1969.]

JAMES CANFIELD MONROE, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

Michael Samuels for Petitioner.

F. LaMar Forshee and Herbert M. Rosenthal for Respondent.

THE COURT.—This is a proceeding to review a recommendation of Disciplinary Board II of the State Bar of California that petitioner be disbarred.

*Questions*: First. *Should the present proceedings be returned to the State Bar for hearings on petitioner's mental competence during the time of the trial committee and disciplinary board hearings?*

*No.* Petitioner has filed a "Petition to Review State Bar Proceedings,"[1] in which he contends that at the time of the preliminary investigation herein and the hearings before the trial committee and the disciplinary board (i.e., March 1966 through August 1967) he was mentally incompetent to cooperate in the preparation or presentation of his defense and that the matter should be referred to the disciplinary board "for hearing upon [his] mental competence" or that this court should determine that issue, presumably after an evidentiary hearing.

It is undisputed (1) that petitioner is now raising for the first time the claim he was mentally incompetent at the time of the hearings in question and (2) that at those hearings he did not have an attorney.

In support of the claim, petitioner has submitted to this court a letter from Daniel Bloch, M.D., Medical Director of Whittier Human Relations Center, Diagnosis and Treatment of Emotional Disorders, dated January 8, 1968, which letter reads: " [Petitioner's attorney] has asked me for a statement relative to [petitioner's] ability to cooperate in his own defense. The conflicts he has had about standards have been com-

---

[1] The "Petition to Review State Bar Proceedings" was not filed until nearly two months after the time for filing a petition for review. (See Bus. & Prof. Code, § 6083; Cal. Rules of Court, rule 59.)

Section 6084 of the Business and Professions Code provides, in part: "When no petition to review . . . has been filed within the time allowed therefor . . . and in any case in which such a petition is filed within the time allowed therefor, the Supreme Court shall make such order as it may deem proper in the circumstances." It would seem that under section 6084 this court has jurisdiction to issue a writ of review even though the petition for review was filed after the time for filing one had expired. Accordingly, such a writ has been issued herein.

plicated by his tendency to deny the existence of problems. This constitutes a fantasy to the degree that *he must be considered incapable of assisting in any defensive operation.* Since he psychologically detaches himself from issues, to him it is as though these issues do not exist. There is a tendency to take on causes which are so taxing that detachment is made easier by virtue of the overwork involved. Denial is thus reinforced by his being able to convince himself that he has no time to do anything in his own behalf. It is his fantasy that others will recognize this and be considerate. One of the problems in helping this man out of the maze of psychological binds in which he is trapped, is the matter of denial and detachment.'' (Italics added.)

Petitioner also refers to ''the psychiatric report'' of Dr. Bloch, apparently referring to a June 30, 1966, report submitted to the trial committee. From that report it appears that petitioner had been seen by Dr. Bloch 15 times before June 30, 1966, for psychiatric evaluation and psychotherapy and had been administered psychological tests and that twice weekly therapy was then scheduled. The report, however, does not show that petitioner was incapable of preparing or presenting a defense.[2]

Petitioner cites *People* v. *Pennington,* 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942], which concerns the right of a defendant in a criminal action to have a hearing as to his sanity at the time of trial. In *Pennington* this court stated (at p. 518) that *Pate* v. *Robinson,* 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836], ''stands for the proposition that an accused has

---

[2]The report reads: ''[Petitioner] is a man with many lofty missions in life—many of which are excessively weighted and some of which may be unfulfillable. He is further bound by standards which, can at times, become oppressive.

''In this framework of lofty missions and high standards, obligations were assumed which became overwhelming. The events leading to [petitioner's] being brought to your Committee occurred during this time. This is clearly a matter resulting directly from, and being a product of, the patient's compulsive character drives.

''The results of psychological testing suggest that [petitioner] is not functioning up to his capacity. A statement from the psychological report is as follows: 'Because he demands so much of himself, not even a superior performance is good enough, so that only in fantasy can he achieve what he demands of himself.'

''[Petitioner's] conscience is such that he is greatly troubled by the events that have taken place; and it is my conviction that he would have sought help for himself as he became aware of the difficulties he might cause others. Now that he is involved in therapy his compulsive drives are such that he should see the program through to completion, presently scheduled at twice a week. There is little or no likelihood that these internal conflicts will find expression in the future in any matter involving other parties such as the . . . matter before you.''

a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary.'' In *Pennington* this court further stated that when the evidence casting doubt on an accused's present sanity is less than substantial, whether to order a present sanity hearing is for the trial court's discretion.

Even if it should be determined that by analogy to cases such as *Pate* v. *Robinson, supra,* 383 U.S. 375, and *People* v. *Pennington, supra,* 66 Cal.2d 508, an attorney is entitled to a hearing upon the issue of his sanity at the time of disciplinary proceeding hearings against him upon the presentation of substantial evidence that he was incapable, because of mental illness, of understanding the nature of the proceedings or participating in his defense, petitioner has presented no such evidence.

Dr. Bloch's report of June 30, 1966, clearly does not constitute such evidence, and although in his January 8, 1968, report Dr. Bloch states that petitioner ''must be considered incapable of assisting in any defensive operation,'' he does not relate his conclusion to any specific time, and it would appear that he was referring to the time his report was written, rather than the time of the hearings. Furthermore, Dr. Bloch does not state what he means by ''defensive operation'' or state how recently or how long he observed petitioner. Under the circumstances, Dr. Bloch's reports do not constitute substantial evidence of prior mental incompetency of petitioner.

The record shows that during the period in question petitioner was actively representing himself and others in his capacity as an attorney, thereby negating his claim that he was then unable to cooperate in his own defense. For example, the transcripts of another disciplinary proceeding against petitioner (Bar Misc. 3161) show that in September and October 1966 and January and February 1967 (i.e., during the period in question) he appeared in propria persona and made objections, examined and cross-examined witnesses, and presented arguments on his behalf. Petitioner likewise actively

participated in still another disciplinary proceeding (Bar. Misc. 2872) during the same period.

The record in the instant proceeding constitutes additional proof that petitioner was capable of understanding the nature of the proceedings and participating in his defense. On April 12, 1966, during the preliminary investigation, he telegraphed the trial committee that he was unable to be present at the hearing on that date because of a jury trial. Thereafter, he was subpoenaed to appear at a hearing on April 26, 1966. At that time he requested a continuance for about ten weeks to allow him ''to get professional medical guidance so as to make the investigation meaningful'' and stated, in part, that he had been advised to see a psychiatrist. The request was granted.

Following the receipt of Dr. Bloch's June 30, 1966, report, petitioner was advised that he would be afforded another opportunity to be heard on August 2, 1966. He appeared on that date and insisted that he could explain why the matter did not involve moral turpitude, and a continuance to August 16, 1966, was granted. He failed to appear at that hearing, and his office reported he would not attend because he had a ''court case.''

In November 1966 a notice to show cause was issued. Thereafter petitioner failed to appear at the two trial committee hearings, which were held in March 1967, despite having been given notice thereof. On the date of the second hearing, the State Bar received a telephone call reporting that petitioner was engaged in trial in department 25 of the Los Angeles Superior Court. A message was delivered to him in that department requesting that he telephone the State Bar, but he did not respond.

After the trial committee recommended disbarment, petitioner wrote the State Bar requesting that the matter be returned to the trial committee, so that he might present evidence. In his letter, he stated, ''I deeply regret being unable to be present at the last hearing date (I was in Salt Lake City, Utah on a necessary appearance for a client).''[3] Petitioner did not support his request by an affidavit setting forth the substance of any new evidence (as required by Rules of Procedure of State Bar, rule 72), and the request was denied.

After the record was filed with this court and the time for petitioning for review had expired, petitioner requested an

---

[3]This appears to be false, since petitioner apparently was in the Los Angeles Superior Court at the time.

extension of time in which to file such petition, stating, in part, that he had been almost continuously engaged in court or administrative trial procedures during the preceding 60 days.

In the face of this record, no hearing is required on petitioner's mental competence to cooperate in his own defense.

Second. *Does the evidence sustain the finding of culpability on the part of petitioner?*

*Yes.* The burden is upon one seeking a review of a recommendation of a disciplinary board to show that its findings are not supported by the evidence or that its recommendation is erroneous or unlawful. (*McKinney* v. *State Bar,* 62 Cal.2d 194, 195 [2] [41 Cal.Rptr. 665, 397 P.2d 425].) In the present case, the record discloses that petitioner has not sustained this burden.

 The record shows that on July 29, 1965, petitioner was retained by Emerson O. Hyatt and Pauline Hyatt, hereinafter referred to as "the Hyatts," to represent them for the purpose of collecting, by foreclosure or otherwise, the balance then due on a principal promissory note in the original sum of $12,000, executed by Norman Peters and Hazel Peters, which note was secured by a deed of trust on real property in the County of Los Angeles. Petitioner charged the Hyatts the sum of $750 as legal fees for his services in the matter. Such fees were paid in full by a series of installments commencing July 29, 1965, and continuing until August 17, 1965.

On August 3, 1965, petitioner informed the Hyatts that he would start foreclosure proceedings with respect to the note and the trust deed. On August 17, 1965, he told Mr. Hyatt that everything was progressing satisfactorily and that the property was in foreclosure and in the hands of a receiver, who was collecting rent. This was a false statement, known to be false by petitioner.

In November 1965 the Hyatts received notice of foreclosure of a prior trust deed on the property held by Harbor Savings & Loan Association, the beneficiary thereunder. Mr. Hyatt promptly notified petitioner of this fact at petitioner's office. Petitioner advised him not to worry, saying that savings and loan associations "got panicky." In reply to a direct question from Mr. Hyatt if Harbor Savings & Loan Association by its foreclosure could wipe him out, petitioner replied, "No," a false statement known by him to be false.

In December 1965 petitioner asked Mr. Hyatt to obtain for him the original note, to be delivered to a Mr. Lake, the

trustee under the deed of trust. Mr. Hyatt obtained the note and delivered it to petitioner the same day.

On December 7, 1965, petitioner appeared at the office of Jasper J. Lake, attorney, the representative of Trans-Recon, Inc., the factual trustee under the deed of trust, and delivered to him the note and trust deed of the Hyatts, requesting foreclosure thereof. This was the first time petitioner had contacted either Mr. Lake or the trustee.

The same day, Mr. Lake prepared a ''Notice of Default and Election to Sell'' and demanded $100 in costs to cover the preliminary costs of the foreclosure. He gave the notice to petitioner, who thereafter, on December 10, 1965, secured the signatures of the Hyatts. On December 17, 1965, petitioner delivered the signed notice to Lake, but did not deliver to him the balance of the necessary costs until some time in January. As a result, the notice of default with respect to the trust deed owned by the Hyatts was not recorded until January 10, 1966.

The action of petitioner in this regard was ineffective to protect the interests of the Hyatts, because on December 1, 1965, Harbor Savings & Loan Association had recorded a notice of default and election to sell under its deed of trust and thereafter caused the property in question to be sold. The deed of trust held by the Hyatts was a purchase money deed of trust and was known to be a purchase money deed of trust by petitioner.

In August 1965 petitioner advised the Hyatts that one Marie A. Simon and Ann Simon, hereinafter referred to as ''the Simons,'' desired to purchase the property, the subject of the Hyatts' deed of trust. Subsequently, on August 25, 1965, petitioner prepared an agreement whereby the Simons agreed to pay petitioner, on behalf of the Hyatts, the sum of $2,450, which sum was to be used as follows: Approximately $1,800 to cure the default on the first trust at Harbor Savings & Loan Association; $500 to cover attorney's fees for the purpose of instituting receivership under deed of trust foreclosure sale; and $150 to pay the costs of the foreclosure sale.

In the event the Hyatts became the owners of said real property as a result of the foreclosure sale, they were to deed the property over to the Simons and take back a second trust deed in the sum of $9,824. In the event the Hyatts did not become the owners of the property as a result of the foreclosure sale, the entire $2,450 was to be returned to the Simons.

On August 25, 1965, Marie A. Simon delivered to petitioner

a check in the sum of $2,450 pursuant to the above mentioned agreement. The check was made payable to "James C. Monroe-Client's Fund Account" (petitioner's trust account). On August 26, 1965, a deposit of $2,450 was made in the account of "James C. Monroe-Client's Fund Account" in the Pacific Industrial National Bank of El Monte. Immediately prior to said deposit, there was a balance of $110 in said account. On September 2, 1965, a check in the sum of $1,753.50 was drawn on the account, leaving a balance of $806.44 remaining therein. Various other checks were written on the account, and on November 3, 1965, a check in the sum of $201.44 was written, after which no balance remained in the account.

From the time of the deposit on August 26, 1965, until the time of the closing out of the account on November 5, 1965, none of the money was applied toward curing the default on the first trust deed or paying foreclosure expenses in connection with the second trust deed, the purpose for which said money was paid to petitioner.

The above facts clearly support the finding of the trial committee, as adopted by the disciplinary board, that, as a result of petitioner's fraudulent misrepresentations, the Hyatts, his clients, suffered great monetary loss, and that petitioner wilfully and fraudulently misappropriated funds of his clients entrusted to him.[4]

Accordingly, the conclusion that petitioner has violated his oath and duties as an attorney within the meaning of section 6103 of the Business and Professions Code, and has wilfully committed acts involving moral turpitude and dishonesty within the meaning of section 6106 of the Business and Professions Code, is warranted.

Third. *Is the degree of discipline (disbarment) appropriate under the circumstances?*

*Yes.* Both the trial committee and the disciplinary board have recommended disbarment in the present matter, and such recommendation is justified in view of the record.

In 1961 petitioner was suspended for a period of nine

[4]In May 1966 the Simons brought an action against the Hyatts and petitioner for the return of the $2,450 paid by them to petitioner. The Hyatts compromised the suit by paying the Simons $1,000.

The Hyatts brought an action against petitioner in the Superior Court of Los Angeles County for damages on the theory of breach of contract, trust, negligence, and fraud. Petitioner did not file an answer, and a default judgment was had against him in the sum of $13,762.12, including exemplary damages in the sum of $1,000. The judgment reads, in part, as follows: "The court finds that the acts of the defendant were willful, intentional, fraudulent and oppressive."

months for a violation of rule 9 of the Rules of Professional Conduct[5] (*Monroe* v. *State Bar*, 55 Cal.2d 145 [10 Cal.Rptr. 257, 358 P.2d 529]) ; and in September 1967, in a matter now pending before this court (Bar Misc. 3161), he was again found to have violated his oath and duties as an attorney within the meaning of section 6103 of the Business and Professions Code.[6]

Since it is difficult to pass upon the weight to be given the testimony of a witness when only the written record is before a reviewing body, it is proper to give great weight to the action of the trial committee which heard it, that body being in a better position than the disciplinary board or this court to pass upon the truthfulness of the testimony. (*McKinney* v. *State Bar, supra,* 62 Cal.2d 194, 196 [5].) As indicated above, the trial committee recommended disbarment herein.

It would appear from the evidence that petitioner over a long period of time failed to meet the high standards demanded of members of the legal profession and that he has on other occasions been disciplined for mishandling funds of a client. His conduct in the instant matter was most reprehensible, and disbarment is an appropriate penalty. (*McKinney* v. *State Bar, supra,* 62 Cal.2d 194, 196-197 [4b].)

It is ordered that petitioner be disbarred from the practice of law, the order to be effective 30 days after the filing of this opinion.

---

[5]Rule 9 of the Rules of Professional Conduct provides, in part: ''A member of the State Bar shall not commingle the money or other property of a client with his own; and he shall promptly report to the client the receipt by him of all money and other property belonging to such client. Unless the client otherwise directs in writing, he shall promptly deposit his client's funds in a bank or trust company, authorized to do business in the State of California, in a bank account separate from his own account and clearly designated as 'Clients' Funds Account' or 'Trust Funds Account,' or words of similar import. . . .''

[6]In Bar Miscellaneous 3161 petitioner was charged with (1) obtaining monies and a promissory note from a client by misrepresenting that he would perform certain legal services, (2) wilfully misrepresenting that he was performing such services, and (3) failing to perform such services or to return the monies or the promissory note to the client. This court in April 1968 ordered therein that petitioner be suspended from the practice of law pending disposition of the present proceedings.