Geza de KAPLANY, Petitioner-Appellant,

v.

J. J. ENOMOTO,* Director of California Department of Corrections, Respondent-Appellee.

No. 73–2955.

United States Court of Appeals, Ninth Circuit.

July 9, 1976.

---

* Heretofore, *de Kaplany v. McCarthy*. The current Corrections Director, Enomoto, has been substituted for the former director McCarthy.

Joseph M. Malkin (argued), Los Angeles, Cal., for petitioner-appellant.

Karl S. Mayer, Deputy Atty. Gen. (argued), San Francisco, Cal., for respondent-appellee.

## OPINION

Before CHAMBERS, KOELSCH, BROWNING, DUNIWAY, ELY, HUFSTEDLER, WRIGHT, TRASK, CHOY, GOODWIN, WALLACE and SNEED, Circuit Judges.

SNEED, Circuit Judge:

This case comes before us on appeal from the district court's denial of de Kaplany's habeas corpus petition seeking relief from his 1963 state conviction. The petitioner asserts that his constitutional rights were violated in four separate respects. The first such respect is that the failure of the trial court to conduct a hearing on de Kaplany's competence to stand trial constituted a denial of due process. The second is that his mental illness substantially impaired his ability to make a reasoned choice with respect to whether to plead guilty or not and that as a consequence his plea of guilty during the "guilt phase"[1] was not knowingly, intelligently, and voluntarily made. The third respect in which de Kaplany alleges his constitutional rights were impaired is that ineffective counsel deprived him of a fair trial. Finally, he contends that the massive, pervasive, and prejudicial publicity that attended his prosecution deprived him of a fair trial.

The district court, after a thorough and comprehensive hearing, denied the petition in all respects. We affirm the district court in all respects.[2]

---

1. In 1963 when de Kaplany was tried, California utilized a trifurcated trial procedure in capital cases where, as in de Kaplany's case a plea of "not guilty by reason of insanity" was joined to a plea of "not guilty": (1) the guilt phase; (2) the sanity phase (Cal.Penal Code § 1026); and (3) the penalty phase (Cal.Penal Code § 190.1).

2. Subsequent to the district court's hearing denying this petition, petitioner was granted parole by the California Adult Authority. This does not moot the case. See Sibron v. New York, 392 U.S. 40, 88·S.Ct. 1889, 20 L.Ed.2d 917 (1968); Pollard v. United States, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957); United States v. Morgan, 346 U.S. 502, 74 S.Ct.· 247, 98 L.Ed. 248 (1954). The status of parolee, though doubtless preferable to that of prisoner, still subjects petitioner to a host of regulations and uncertainties for the term of his parole, including the ever present threat that his parole may

## I.

### Absence of Hearing On Competency To Stand Trial.

Much of petitioner's effort is directed toward establishing that prior to judgment in the state proceedings in which he was convicted the judge conducting such proceedings ought to have entertained a bona fide doubt about the competency of the petitioner to stand trial and, in keeping with the teaching of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) and *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), should have ordered a hearing to determine such competency. The evaluation of this contention requires both a brief description of the petitioner's trial and certain portions of the evidence presented therein as well as an analysis of the applicable legal principles.

## A. The Trial.

We turn first to the brief description of the trial and the pertinent evidence. The district court in which this petition was heard set forth in its opinion a chronology of events which we adopt and set forth in the margin.[3] This chronology reveals that prior to the commencement of jury selection on January 7, 1963 three psychiatrists appointed by the trial court had examined the petitioner and that two of them, Drs. Johnsen and Rappaport, had filed their written reports with the trial court. Dr. Johnsen's report stated that the petitioner was "sane at the time of the commission of the alleged crime and that he is presently sane." Dr. Rappaport in his report stated that the petitioner was "presently suffering from no mental illness and is able to cooperate with counsel and to assist counsel in the preparation and presentation of a rational

be revoked. *See* Cal. Penal Code §§ 3053–3056, 3059–3062 (West 1972). Additionally, a record of a conviction for a serious felony will likely pose problems for petitioner which can only be solved by a vindication of his innocence. These considerations bring the case within the rule stated in *United States v. Morgan, supra*:

"Although the term has been served, the results of the conviction may persist. Subsequent convictions may carry heavier penalties, civil rights may be affected. As the power to remedy an invalid sentence exists, we think, respondent is entitled to an opportunity to attempt to show that this conviction was invalid." 346 U.S. at 512–13, 74 S.Ct. at 253.

**3.** The alleged crime for which petitioner was subsequently convicted and imprisoned occurred on the evening of August 28, 1962. Petitioner was arrested and placed in custody the same day. The victim, then petitioner's wife, did not die until September 30, 1962.

On August 29, 1962, one day after petitioner's arrest, Dr. Peschau, a psychiatrist, examined petitioner in the county jail at the request of the District Attorney of Santa Clara County.

On October 3, 1962, petitioner was indicted by the Grand Jury of Santa Clara County and charged with the crime of murder by torture (Petitioner having allegedly murdered his wife by pouring nitric acid over her body), in violation of California Penal Code § 187. On October 11, 1962, petitioner entered two pleas to this charge: (1) not guilty, and (2) not guilty by reason of insanity.

On October 11, 1962, the trial court appointed three psychiatrists—Drs. Johnsen, Rappa-

port, and Shoor, to examine petitioner and investigate his sanity. Pursuant to said appointment, petitioner was examined by Drs. Johnsen and Rappaport on October 14, October 31, and November 11, 1962, and by Dr. Shoor on October 18, October 25, and October 26, 1962. On November 11, 1962, Drs. Johnsen and Rappaport filed their written reports with the trial court. Dr. Shoor filed his report with the court on February 8, 1962. [sic]

On December 13, December 14, and December 15, 1962, petitioner was psychiatrically examined by a Dr. Zaslow at the request of petitioner's defense counsel. On December 20, 1962, again at the request of defense counsel, petitioner was examined by a Dr. Beaton. On December 27, and December 30, 1962, again at the request of defense counsel, petitioner was examined by Dr. Lee.

On January 7, 1963, jury selection began and on January 14, 1963, the guilt phase of petitioner's trial began. Two days later, on January 16, 1963, petitioner was allowed by the trial judge after a colloquy between petitioner and the court to change the first of his pleas from not guilty to guilty.

The 28-day sanity phase of petitioner's trial began on January 21, 1963, and lasted until February 21, 1963, when the jury returned a verdict finding petitioner sane at the time of the commission of the offense.

The penalty phase of the trial began four days later, on February 25, 1963, and on March 1, 1963, the jury returned a verdict of life imprisonment. Judgment and sentence were imposed on March 15, 1963.

defense." The third report, that of Dr. Shoor, was filed on February 8, 1963 and stated that, while the petitioner displayed "some suicidal thinking of the obsessional variety," he was "sane now and at the time of the commission of the alleged offense."

■ On January 14, 1963, the guilt phase of the petitioner's trial began. On the second day of the trial, in response to the prosecution's exhibiting in the courtroom a gruesome morgue photograph of his slain wife's body, the petitioner jumped to his feet shouting "No, no, what did you do to her?" He was forcibly restrained and reseated. The next day petitioner changed his plea to guilty. The hearing in the district court on this petition contains testimony by petitioner's attorney in the state trial that the guilty plea was a vital part of his strategy to preclude a long trial on guilt during which the jury repeatedly would be confronted with the gruesome nature of the petitioner's crime. By moving quickly to the sanity phase the attorney believed the petitioner would be positioned more favorably with respect to the jury. The habeas hearing also indicates, however, that the petitioner resisted this strategy for some time although its purpose was known to him. His resistance sprang from his belief that he was not guilty because he had not intended to kill his wife. Although he asserted his resistance was broken by coercion on the part of his attorney, this was vigorously denied by the attorney and the district court found that he was not coerced. This finding is adequately supported by the evidence and is not clearly erroneous.

■ The state trial court asked petitioner's attorney at the time of the guilty plea whether he had explained to the petitioner the nature and consequences of his plea. The attorney said he had. The trial court, in a manner somewhat less elaborate than is the practice since *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969),[4] asked de Kaplany whether he knew that he had been indicted for murdering his wife, whether he had discussed the matter with his counsel, and whether he fully understood the consequences of the change of his plea. To which he answered responsively, but briefly, "Yes, your Honor", "Yes I did", and "I do". He was not asked if he understood the change of plea might subject him to the death penalty. There seems little doubt that he understood this, however, because his first attorney, who was not his attorney at trial, had informed him of the possibility of being sentenced to die.

To summarize, immediately prior to the commencement of the sanity phase of the trial the state trial court judge confronted a situation in which (1) the reports of three psychiatrists had been filed, none of which expressly or impliedly had indicated that the petitioner was incompetent to stand trial, although none of them precisely had focused on this issue, (2) an attorney for the petitioner who apparently believed his client was competent to stand trial, (3) an outburst in the courtroom as already indicated, (4) a courtroom demeanor otherwise beyond reproach, and (5) a guilty plea apparently made voluntarily and understandingly.

Commencing with the sanity phase of the proceedings the mental condition of de Kaplany properly became the center of attention. Three defense psychiatrists, Drs. Zaslow, Lee and Beaton, who at the request of

---

**4.** It is well settled that the requirement of making a record confirming the voluntariness of an accepted guilty plea mandated by *Boykin* is not applied retroactively. *Moss v. Craven*, 427 F.2d 139, 140 (9th Cir. 1970). *See also Scranton v. Whealon*, 514 F.2d 99, 101 (6th Cir. 1975); *Winford v. Swenson*, 517 F.2d 1114, 1117 (8th Cir. 1975). Those pleas antedating *Boykin* are constitutionally tested against whether they were "voluntarily and understandingly given in light of the totality of the circumstances." *Winford v. Swenson, supra* at

1117. *See In Re Tahl*, 1 Cal.3d 122, 127, 81 Cal.Rptr. 577, 460 P.2d 449 (1969). Our review of the record convinces us not only that the trial court made a creditable effort to assure itself that petitioner knowingly and willingly entered his plea, but also that de Kaplany was in fact aware of the potential consequences of his plea and voluntarily accepted them. There is, therefore, no constitutional infirmity in the manner in which the state trial court judge accepted petitioner's guilty plea.

defense counsel had examined de Kaplany, testified regarding his mental condition.

Dr. Zaslow testified that on the basis of certain standard psychological tests the petitioner was "severely disturbed" and displayed an "impairment of the conceptual thinking and use of proper judgment." Dr. Beaton, in describing the petitioner's "present mental condition," stated that petitioner was "very seriously ill, psychiatrically, psychologically," but that he "knew the difference between right and wrong in the ordinary sense of intellectually knowing." Dr. Beaton also stated that in his opinion petitioner was suffering from paranoid schizophrenia and that petitioner was "not able rationally, logically and consciously to govern his actions." During Dr. Beaton's testimony he also expressed the view he suspected the petitioner had had an "ambivalent relationship with his mother all along," and that his mother was a feminine ideal for him and a "somewhat rejecting woman." At this point, petitioner interrupted and said in a loud, high voice, "Don't talk like this about my mother."

Dr. Lee, whose testimony was the most colorful offered by the defense, gave the opinion that the offense was committed during an acute schizophrenic reaction and that the petitioner suffered from a multiple personality syndrome. It also appeared during Dr. Lee's testimony that the petitioner in 1946 while a citizen and resident of Hungary had been hospitalized in a neuropsychiatric institution for several weeks.

None of these witnesses expressed an opinion with respect to petitioner's competence to stand trial and plead guilty. Their testimony quite understandably was directed to the issue of responsibility for the crime.

The prosecution's witnesses, Drs. Johnsen, Rappaport, and Shoor, testified along the lines set forth in their earlier reports. Dr. Johnsen testified that petitioner was "sane at the time of the commission of the alleged crime and that he is presently sane." The testimony of Dr. Rappaport indicated that petitioner was presently suffering from no mental illness and was competent to cooperate with counsel and to assist counsel in the presentation of a rational defense. Dr. Shoor testified that petitioner displayed "some suicidal thinking of the obsessional variety," but that he was "sane now and at the time of the commission of the alleged offense."

The sanity phase of de Kaplany's state trial came to an end after 28 days when the jury returned a verdict finding him sane at the time of the commission of the crime. The penalty phase commenced four days later and transpired without any incidents relevant to this proceeding. On March 1, 1963, the jury returned a verdict of life imprisonment.

## B. The Law.

The petitioner's contention regarding the state trial court's failure to conduct a hearing to determine his competency to stand trial rests upon *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), as applied in *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), *Tillery v. Eyman*, 492 F.2d 1056 (9th Cir. 1974), and *Moore v. United States*, 464 F.2d 663 (9th Cir. 1972).

Before turning to examine these authorities the standard by which competency to stand trial is measured should be stated. In *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), the Supreme Court held that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Id.* An orientation as to time and place and some recollection of events is not enough.

In *Pate v. Robinson, supra,* the Court held that where the evidence raises a "bona fide doubt" as to a defendant's competence to stand trial, the trial judge on his own motion must empanel a jury and conduct a hearing to determine competency to stand trial. In determining whether the evidence before the trial judge in the state proceedings in which Robinson was convicted should have entertained such a "bona fide

doubt," the Court reviewed the history of the events of Robinson's life that it deemed relevant to the issue of Robinson's competence [5] and concluded that this evidence did entitle him to a hearing. The failure to provide the hearing "deprived Robinson of his constitutional right to a fair trial." 383 U.S. at 385, 86 S.Ct. at 842. As in *Dusky*, the Court emphasized that courtroom demeanor, indicating alertness and understanding, alone could not be relied upon to establish competency and justify "ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior." *Id.* at 385–86, 86 S.Ct. at 842.

In *Moore*, an appeal from a district court's dismissal of an application for Section 2255 relief, this court was confronted with an applicant who had received a psychiatric examination under 18 U.S.C. § 4244. Even though the psychiatrist's report concluded that Moore was competent to stand trial, it nonetheless consisted of a recital of "an extensive history of mental illness, including hospitalizations for psychiatric disorders and repeated suicide attempts." 464 F.2d at 665.[6] In the face of this report, in which the psychiatrist's conclusion was markedly at variance with the body of his report and extensive records from the Federal Bureau of Prisons, we concluded that these reports "constituted substantial evidence casting a reasonable doubt upon Moore's competency to stand trial as a matter of law." *Id.* at 666.

In describing the principles of *Pate v. Robinson* we stated:

"Under the rule of *Pate v. Robinson* (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, a due process evidentiary hearing is constitutionally compelled at any time that there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial. 'Substantial evidence' is a term of art. 'Evidence' encompasses all information properly be-

5. The evidence pointing to possible incompetency came from several sources and had great cumulative impact. The Supreme Court noted that "The uncontradicted testimony of four witnesses called by the defense revealed that Robinson had a long history of disturbed behavior." 383 U.S. at 378, 86 S.Ct. at 838. This history included confinement in a mental institution following a violent fit in which he kicked a hole in his mother's bar and tried to jump from a cab carrying him to the hospital. The medical records at the hospital revealed that he suffered from frightening hallucinations, and that his behavior suggested schizophrenia.

His irrational periods became even more violent. He served four years in prison for an episode in which he shot and killed his 18-month-old son and attempted suicide. Subsequently, he attacked and seriously injured his mother's brother-in-law, causing her to swear out a police warrant for his arrest. Finally, he was arrested for the killing of the woman with whom he was living. This history, coupled with the testimony of four witnesses that Robinson was insane and the contention of Robinson's attorney that he was "presently insane," caused the Supreme Court to conclude that a "bona fide" doubt regarding Robinson's competency to stand trial should have arisen in the trial judge's mind.

6. We described the report as follows:

"The psychiatrist's report reveals an extensive history of mental illness, including hospitalizations for psychiatric disorders and repeated suicide attempts. During his stay at the Federal Medical Center, he was 'kept in isolation and developed visual hallucinations.' In describing Moore's mental condition at the time of the examination, the psychiatrist said: 'Abnormal mental trends were manifested by self-destruction, mutilating behavior which occurs under stressful conditions. . . . He panics and has engaged in dangerous behavior to himself such as running before gunfire and swallowing razor blades in an attempt to get into a more protective situation. His mood swings are wide and rapid from deep depression and to euphoria in a brief period . . . . His main problem is in sexual identity with fear of both men and women and this leads to panic. He will continue to act out both in custodial and psychiatric hospital placements. He feels that he has nothing to lose and therefore engages in impulsive acting out and controls the environment through his self-destructive acts.'

"The psychiatrist's diagnosis was that Moore's 'competency will be subject to periods of impaired judgment during his panic reactions,' that he has 'deep-seated emotional problems of long duration,' and 'the prognosis is poor.' He nevertheless concluded that 'Moore is presently sane and presently able to understand the proceedings taken against him and to properly assist in his own defense.' The psychiatrist did not undertake to offer any explanation for his ultimate conclusion." 464 F.2d at 665.

fore the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competency to stand trial. Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying *Pate's* substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? It [sic] sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency. At any time that such evidence appears, the trial court *sua sponte* must order an evidentiary hearing on the competency issue. It is only after the evidentiary hearing, applying the usual rules appropriate to trial, that the court decides the issue of competency of the defendant to stand trial." *Id.* at 666.

*Tillery v. Eyman,* 492 F.2d 1056 (9th Cir. 1974), added nothing new to the *Moore's* formulation of the *Pate* standard and the manner in which it should be applied. Tillery exhibited on frequent occasions erratic and irrational behavior while in custody and in the presence of the court. This behavior led one psychiatrist to question his competency to stand trial while another thought him competent. The state trial court judge and defense counsel appeared to have doubted Tillery's competence although a contemplated additional psychiatric examination appears never to have been made and no evidentiary hearing was held. *Id.* at 1057–59. Obviously the failure to hold such a hearing required that Tillery's petition for habeas corpus be granted.

Before applying these authorities to de Kaplany's petition one additional case of this circuit should be mentioned. It is *Laudermilk v. California Department of Corrections,* 439 F.2d 1278 (9th Cir. 1971). In that case a habeas petition was denied by the district court and in affirming that denial

we stated that we did so for the reasons set forth in *People v. Laudermilk,* 67 Cal.2d 272, 61 Cal.Rptr. 644, 431 P.2d 228 (1967). In *Laudermilk* the petitioner had murdered his wife after suspecting her of infidelity. Pursuant to California law, two psychiatrists examined Laudermilk and reported *inter alia* that he had been found by two or three psychiatric hospitals to be mentally ill "but not psychotic and not in need of supervision, care and treatment," 61 Cal.Rptr. at 647, 431 P.2d at 231, that he appeared to be able to understand his situation very well, that his intelligence was average, and that he was sane when he committed the crime and was presently sane. Thereafter counsel for Laudermilk moved that criminal proceedings be suspended on the ground that Laudermilk was not competent to stand trial. The state trial court denied the motion on the ground that the medical reports did not lead "even to a suspicion" regarding Laudermilk's competence but did agree to appoint another psychiatrist to examine him.

Before the third psychiatrist reported the trial began with the guilt phase and, as in de Kaplany's trial, aborted quickly with a guilty plea. In Laudermilk's trial, however, the plea of not guilty by reason of insanity was also withdrawn and the prosecutor and defendant stipulated that the court fix the degree of crime as first degree.

Before fixing the penalty the state trial court received the report of the third psychiatrist as well as that of a fourth. The report of the third found Laudermilk able to ascertain right from wrong to assist in his defense but possessing a paranoid personality. It recommended that he be placed in an adequate psychiatric facility under the jurisdiction of the penal system. The fourth psychiatrist's report agreed Laudermilk had a paranoid personality but was competent to stand trial. Upon Laudermilk's waiver of a jury trial regarding the penalty and a recommendation of life imprisonment in an appropriate psychiatric facility by the prosecutor and defense counsel, the state trial court sentenced Laudermilk to life with the observation that the prison

authorities would be able to determine best where he should serve his sentence.

Laudermilk appealed his conviction on the ground that an evidentiary hearing on competence should have been conducted. He relied particularly on *People v. Pennington*, 66 Cal.2d 508, 58 Cal.Rptr. 374, 426 P.2d 942 (1967), in which the Supreme Court of California said:

> "*Pate v. Robinson* stands for the proposition that an accused has a constitutional right to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense. Once such substantial evidence appears, a doubt as to the sanity of the accused exists, no matter how persuasive other evidence—testimony of prosecution witnesses or the court's own observations of the accused—may be to the contrary. . . . [W]hen defendant has come forward with substantial evidence of present mental incompetence, he is entitled to a section 1368 hearing as a matter of right under *Pate v. Robinson* . . . ." *Id.* at 381, 426 P.2d at 949.

Laudermilk's reliance was premised on the contention that *Pennington* required that only evidence indicating incompetence of the accused to stand trial be marshaled to determine whether it amounted to substantial evidence of incompetency. As Laudermilk read *Pennington*, if such evidence was substantial a hearing was required no matter how compelling was evidence to the contrary. Despite the fact that the author of *Pennington*, Justice Peters, also interpreted it in this fashion,[7] the majority of the Supreme Court of California, after examining *all* the pertinent evidence before the trial court, held that Laudermilk "did not produce substantial evidence of present mental incompetence so that it could be said that a doubt as to [Laudermilk's] present sanity was raised in the mind of the trial judge and the latter was compelled to order

that the question as to defendant's sanity be determined by a trial." 61 Cal.Rptr. at 653, 431 P.2d at 237.

Moreover, the Supreme Court of California indicated that under *Pate* and *Pennington* "more is required to raise a doubt than mere bizarre actions [citations omitted] or bizarre statements [citations omitted] or statements of defense counsel that defendant is incapable of cooperating in his defense [citations omitted] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense. [citations omitted]." *Id.* And finally it refused to fragment the report of a psychiatrist focusing only on those features indicating incompetence when on balance the psychiatrist had concluded Laudermilk was competent to stand trial. 61 Cal.Rptr. 655, 431 P.2d at 239.

As we did on appeal from the denial of Laudermilk's habeas petition, we once more approve these views of the Supreme Court of California. Nor do we regard *Moore* and *Tillery* as inconsistent with this approval. Two sentences in *Moore*, already set forth above at p. 981, have been advanced by de Kaplany's counsel in this proceeding to support the view that this circuit, in effect, has adopted the approach of Justice Peters. These two are:

> "Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competency to stand trial. Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence."

We interpret these two sentences to mean nothing more than that once good faith doubt exists, or should exist, its resolution requires a hearing. These sentences do not mean that doubt necessarily exists, and thus a hearing is required, because certain evidence exists which would create a doubt were it not for other evidence which precludes doubt. Genuine doubt, not

---

7. *See* Justice Peters' dissent in *Laudermilk*, 67 Cal.2d 272, 61 Cal.Rptr. 644, 655, 431 P.2d 228, 239.

a synthetic or constructive doubt, is the measuring rod.[8] The emergence of genuine doubt in the mind of a trial judge necessarily is the consequence of his total experience and his evaluation of the testimony and events of the trial.

 Moreover, *Pate* and *Drope* teach that appellate review of a failure to provide a hearing on competence to stand trial is comprehensive and not limited by either the abuse of discretion or clearly erroneous standard. The question to be asked by the reviewing court is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.

## C. The Evaluation.

In applying these principles to the failure of the state trial court to conduct an evidentiary hearing on de Kaplany's competency to stand trial we shall focus on the three phases of his trial. With respect to the guilt phase we cannot conclude that at anytime during this phase the state trial court judge should have entertained a good faith doubt concerning de Kaplany's competency. The courtroom outburst described above cannot be considered without also considering the reports of the three psychiatrists, the apparent belief of defense counsel that his client was competent, and the demeanor

of de Kaplany prior and subsequent to his outburst. It is important to remember that the state court at no time was confronted with evidence of a long and extensive history of irrational behavior and mental illness as in *Pate, Drope,* and *Moore.* Nor was he, as in *Tillery,* confronted with a psychiatric report which threw doubt on the defendant's competency to stand trial. The absence of a good faith doubt as to competency at this point in the trial was reasonable.

The sanity phase of the petitioner's trial poses a more difficult issue. Framing the issue favorably to the petitioner, it is whether the state trial court should not have entertained a good faith doubt as to competence of petitioner to stand trial in the light of the evidence introduced by the defense regarding petitioner's sanity and all other relevant circumstances known to the court. We believe, and so hold, that he should not have entertained such a good faith doubt.

To support this holding we point out that the psychiatric testimony favorable to the petitioner presented during the sanity phase was directed toward his responsibility under the criminal law for the crime and not to his competency to stand trial. We are not prepared to assert that in every trial in which the sanity of the defendant is contested there must exist a good faith doubt which requires a hearing on competency.[9] Of course, where the testimony re-

---

**8.** This interpretation of the "substantial evidence" test is entirely consistent with the California approach exposited in *People v. Laudermilk, supra,* and accepted by this court in *Laudermilk v. California Department of Corrections, supra.* Far from demanding that the trial judge accept all evidence indicating incompetency as true, the California Supreme Court called attention to a situation in which the trial court should be wary of uncritical acceptance of such evidence. In regard to basing a finding of a reasonable doubt as to competency on the contention of counsel for the accused that the defendant was incompetent to stand trial, the Court said:

"The statement of defendant's counsel . . . made to the court on the day of trial, while of some significance, in our view cannot raise the requisite doubt and, even if considered in combination with other evi-

dence as we discuss infra, *is of limited probative value. . . .* [W]hile not discounting statements of counsel in proper cases, we hesitate to articulate a general rule requiring the trial court to grant a section 1368 hearing in every instance where defense counsel reports that his client is . . . unable to discuss the case. Such a rule would be fraught with risk that the administration of justice would be thwarted by defendant's refusing to cooperate with their counsel or *feigning incapacity to do so so as to obtain a section 1368 hearing.*" 61 Cal.Rptr. at 654, 431 P.2d at 238. (Emphasis added).

**9.** We find it significant that the California Supreme Court has been similarly unwilling to equate proof of a history of mental disorders with substantial evidence of incompetency at the time of trial. In *People v. Bievelman,* 70 Cal.2d 60, 73 Cal.Rptr. 521, 447 P.2d 913

garding sanity also suggests incompetency the trial court must be alert to the possibility of having to require a hearing on competency. While it may have been the case

(1968), it was determined that "substantial evidence" had not been adduced by a showing of seven occurrences of defendant speaking out in court and one occasion of audible laughter, psychiatric testimony that defendant was a narcotics addict and had recently attempted suicide, and testimony of a second psychiatrist that defendant may have been suffering from a mental disorder.

This case was followed by *Monroe v. State Bar of California*, 70 Cal.2d 301, 74 Cal.Rptr. 733, 450 P.2d 53 (1969). It was there decided that even if the *Pate v. Robinson* standard applied to attorney disciplinary hearings, a showing of "substantial evidence" was not made by the production of evidence that petitioner had had a history of psychiatric treatment and had been described in a post-trial psychiatric report as "incapable of assisting in any defensive operation." In reaching this conclusion the Court dismissed out of hand the suggestion that prior psychiatric treatment constituted "substantial evidence," and held that the post-trial report did not address the fundamental question of whether defendant was competent at the time of trial because it did not specify either what was meant by "defensive operation," or whether defendant's period of incapacity included the time of trial. The Court thus indicated that only evidence having strong probative impact relevant to the defendant's competence at the time of trial will require the trial court to conduct *sua sponte* a hearing on defendant's competency to stand trial.

*People v. Coogler*, 71 Cal.2d 153, 77 Cal.Rptr. 790, 454 P.2d 686 (1969), the latest California Supreme Court opinion dealing with this issue, contains the strongest statement that evidence of incompetency is not "substantial" unless directed to the defendant's condition at the time of trial. In that case a psychiatrist testified that the defendant had frequently experienced "contemporaneous disassociation reactions," which caused "basic rearrangements of the mind to the point that there is impairment of consciousness in that several areas of the mind that are normally available and participate in mental work are rendered unavailable or are walled off. These parts that are . . . rendered unavailable are typically those things that have to do with either a particular set of standards or attitudes or a set of restrictions or set of controls that normally are effective and operative." The psychiatrist further testified that defendant had a mild memory impairment and appeared to be chronically depressed. The consequence of these mental disorders was that defendant, though "superficially intact as to his emotional control and intellect," could become "acutely psychotic." The doctor explained that defendant's psychotic state could be accompanied by "intellectual impairment involving the ability to perceive accurately or be aware of what is occurring," or by "impairment of emotional reactions, either experiencing no feelings or experiencing excessive feelings," or both. The psychiatrist's testimony indicated that when the defendant experienced a disassociation reaction he would encounter difficulty concentrating, and "the slightest sound or sight would irritate him greatly; at times he enters a state of uncontrollable rage and becomes destructive of property. When he emerges from one of these spells he can recollect little or nothing of what has occurred." The psychiatrist concluded that defendant suffered from either organic brain damage similar to psychomotor epilepsy, or from a functional disorder, or from both.

The defendant also offered into evidence the following: the testimony of a neurologist that the defendant's past behavior suggested an organic dysfunction of the mental process involving impairment of intellect and memory; the results of tests administered by a clinical psychologist which indicated both organic brain damage and that defendant was a borderline schizophrenic who could become psychotic for periods of time under stress; and the testimony of a former chaplain of a prison in which defendant was incarcerated that defendant had told him that he had spells of rage which he could not later remember.

Notwithstanding this impressive accumulation of evidence to the effect that defendant was subject to periods of mental incapacity, the California Supreme Court declined to hold that the trial court was required to order a competency hearing on its own motion. As it said:

"Having reviewed the record, we find no substantial evidence tending to show that defendant did not understand the nature of the proceedings against him or was unable to assist in his own defense; defense counsel does not contend that the trial court should have ordered a hearing under section 1368. Defendant's alleged mental disability at the times of the commission of the crimes avowedly stemmed from a contemporaneous disassociation reaction; the record does not show that defendant experienced any such reaction during the proceedings against him." 71 Cal.2d at 168 n. 7, 77 Cal.Rptr. at 799, 454 P.2d at 695.

It is clear from these cases that the California Supreme Court's "substantial evidence" test requires the evidentiary showing to be directed to the question of defendant's competency *at the time of trial*; a history of mental disorders, or evidence showing a present disorder which does not bear on defendant's competency to stand trial, is not enough.

that de Kaplany at the time of his trial was suffering from a mental illness, we cannot say that the evidence supporting this diagnosis, when placed in its context, which includes psychiatric testimony suggesting sanity and no mental illness, was sufficient to generate a good faith doubt about his competence to stand trial.

We also are aware that during the sanity phase of a trial the judge may well be reluctant to interrupt those proceedings to conduct a competency hearing which generally will involve the testimony of the same psychiatrists presently testifying with respect to sanity of the defendant. This reluctance must not serve as an excuse to suppress the emergence of a good faith doubt regarding competence; however, in reviewing a failure to so interrupt the sanity phase, we must bear in mind that a trial judge may be interested in hearing as much as he can before he concludes that he does entertain a good faith doubt.

Little need be said concerning the penalty phase of the petitioner's trial. Certainly the verdict of sanity, viewed in its context, does not suggest a good faith doubt as to petitioner's competence to stand trial. Nor did any event that occurred during this phase of the trial so suggest.

[4] Thus, we conclude that the district court properly concluded that the failure of the state trial court to conduct a hearing on the petitioner's competence to stand trial did not deny him his due process right to a fair trial.

## II.

### *Validity of Guilty Plea.*

The petitioner's contention that his mental illness substantially impaired his ability to make a reasoned choice with respect to whether to plead guilty rests on this court's decision in *Sieling v. Eyman*, 478 F.2d 211 (9th Cir. 1973). There we held that a defendant is not competent to plead guilty if a mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature and consequences of his plea. *Id.* at 215. Consistent therewith we also held that trial courts should "assess a defendant's competency with specific reference to the gravity of the decisions with which the defendant is faced." *Id.*

While these holdings have been criticized both for recognizing a state of semi-competence which permits a trial but denies a defendant the opportunity to plea bargain, and for providing an additional ground fraught with psychiatric uncertainties for collateral attack on guilty pleas,[10] we adhere to our position. Moreover, we recognize that at no time did the state trial court focus its attention specifically on the issue whether de Kaplany, assuming he was competent to stand trial, also was competent to take the serious step of surrendering certain fundamental constitutional rights by pleading guilty. Under these circumstances in *Sieling v. Eyman* we remanded the proceedings to the state court to resolve the question of competency to plead guilty. We do not believe this form of relief is always necessary or appropriate.

The hearing before the district court on this petition was quite thorough with respect to competence to plead guilty. Somewhat surprisingly, in view of the period of time that has elapsed since de Kaplany's trial, several of the psychiatrists who testified at the trial, as well as petitioner's counsel at the trial, appeared and testified at the hearing in the district court. As a result of the hearing the district court concluded:

"Notwithstanding testimony by doctors at the present habeas corpus hearing concerning their observations of petitioner after his conviction and during his ultimate imprisonment, and their opinions based thereon, we cannot say and are unable to find or conclude from the evidence before us, considered as a whole, that petitioner in fact lacked the requisite mental capacity to stand trial or that he in fact lacked the requisite mental capacity to enter his plea of guilty, within the

---

**10.** 1974 Duke L.J. 149 (1974).

meaning of the authorities cited, supra. Nor can we say or find that petitioner's change of plea was involuntary because of coercion by his attorney or otherwise. It may be noted that, according to the evidence, petitioner was sufficiently aware, assertive and resistant to pressure as to dismiss his first attorney and to engage other counsel to try his case."

■ We have reviewed the record of the hearing and agree with this conclusion. Due process does not require another hearing on this issue nor would any useful purpose be served thereby. Under the circumstances of this case we believe a retroactive determination of competency to plead guilty not only is possible but also appropriately was made by the district court. In expressing this view we do not intend to suggest that where a retroactive determination is possible a remand to the state court for such a determination is not usually a proper form of relief. We only hold that under the circumstances of this case, the petitioner suffers no deprivation of a constitutional right as a result of the procedures we have adopted.[11]

### III.

#### Effectiveness of Counsel.

The petitioner strongly contends that his counsel at the state trial provided ineffec-

tive assistance primarily because he did not, during the guilt phase of the trial, plead "diminished capacity or responsibility" (*See People v. Gorsham*, 51 Cal.2d 716, 336 P.2d 492 (1959); *People v. Wells*, 33 Cal.2d 330, 202 P.2d 53 (1949)) to the offense, murder by torture, with which the petitioner was charged. It is argued that such a plea would have placed upon the prosecution the burden of proving no diminished capacity or responsibility while the plea of guilty placed upon the petitioner the burden of establishing insanity. As previously indicated, petitioner's counsel at the state court trial in the hearing on this petition contended that he rejected the plea of diminished capacity and urged a plea of guilty to eliminate to the extent possible a presentation of evidence during the guilt phase of the trial which would direct the jury's attention to the many days of suffering endured by petitioner's wife before she died. Only in this manner, petitioner's counsel at the state trial argued, could he hope to save petitioner from a sentence of death.

Petitioner also contends that his counsel at the state trial was ineffective because he did not ask for a hearing on petitioner's competence to stand trial. Counsel in the district court hearing responded by pointing out that he had no reason to doubt the petitioner's competence to stand trial and

---

11. In *Pate* the Supreme Court emphasized the difficulty of conducting a fair post-conviction hearing on the defendant's competency at trial. The Court there reasoned that the inability of the jury to observe the demeanor of the accused, the fact that expert testimony would have had to have been based solely on the printed record, and the six-year lapse between the time of trial and the proposed post-conviction hearing combined to compromise such a hearing beyond redemption. 383 U.S. at 387, 86 S.Ct. 836. Similar situations have since been recognized in which considerations like these, which inevitably cloud hearings held to determine the existence and nature of past states of mind, have rendered ineffectual retrospective hearings and thereby necessitated new trials. *See Drope v. Missouri, supra* at 183, 95 S.Ct. 896; *Moore v. United States, supra*, at 666–67; *Tillery v. Eyman, supra* at 1059. However, even recognizing as we do the difficulties inherent in *nunc pro tunc* hearings held for this purpose, we do not believe that they are neces-

sarily unmanageable. *See Nathaniel v. Estelle*, 493 F.2d 794, 798 (5th Cir. 1974); *Bruce v. Estelle*, 483 F.2d 1031, 1038 (5th Cir. 1973); *Lee v. Alabama*, 386 F.2d 97, 108 (5th Cir. 1967) (en banc). The threshold question is whether the circumstances surrounding the case permit a fair retrospective determination of the defendant's competency at the time of trial.

We conclude that such a determination was possible here. Although many years passed between the trial and the hearing, several key expert witnesses whose testimony was featured at the trial were able to attend the hearing, as was defendant's trial counsel. Additionally, many pages of expert testimony, prepared for the trial and addressed to the issue of defendant's competency at the time of trial, were available at the hearing. In light of the presence of these key evidentiary items, it is not unreasonable to conclude that a fair retroactive hearing could be and was conducted.

that the reports of the psychiatrists then available to him did not suggest incompetence.

Finally, petitioner contends that his counsel was ineffective in that he failed to request a change of venue of the trial to reduce the adverse impact of the publicity surrounding the case. Once more counsel responded by pointing out that in his opinion a jury selected from Santa Clara County, which sentenced the petitioner to life imprisonment, served the interests of the petitioner better than one from another county. Counsel avers that he believed at the time that such a verdict was more likely in Santa Clara County than elsewhere.

There has never been a trial, certainly not one as closely watched as was petitioner's, with respect to which there have not been arguments between attorneys and others about the strategy adopted by the opposing counsel. So it is in this case. Moreover, it is understandable that one who is convicted, even though execution was avoided, will forever ponder about what might have been had the strategy been different.

█ Our task, however, is to measure the conduct of the petitioner's counsel against the applicable standard. Whether we use the standard of performance so poor and incompetent as to make the trial a farce or mockery of justice (*United States v. Stern*, 519 F.2d 521, 524 (9th Cir. 1975); *Wright v. Craven*, 412 F.2d 915 (9th Cir. 1969); *Dalrymple v. Wilson*, 366 F.2d 183, 185 (9th Cir. 1966)), or of whether the circumstances show a denial of fundamental fairness (*United States v. Stern, supra*, at 525; *Mengarelli v. United States*, 476 F.2d 617, 619 (9th Cir. 1973); *Johnson v. Craven*, 432 F.2d 418 (9th Cir. 1970)), or of lack of effective aid in the preparation and trial of the case—lack of counsel likely to render and rendering reasonably effective assistance (*Leano v. United States*, 457 F.2d 1208 (9th Cir. 1972); *Brubaker v. Dickson*, 310 F.2d 30, 37 (9th Cir. 1962)), the result is the same. Petitioner was not deprived of the effective assistance of counsel. Thus we need not choose between these standards.

## IV.

*Effect of Publicity or Right to Fair Trial.*

█ Our holding with respect to the effectiveness of petitioner's state trial counsel foreshadows our views with respect to petitioner's contention that massive, pervasive, and prejudicial publicity prevented him from receiving a fair trial. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Petitioner appears to recognize the insubstantiality of this argument by failing to press it with any vigor either in the hearing in the district court or in his arguments presented to us. Although the trial of de Kaplany attracted considerable attention from the press, radio, and television, we hold the circumstances surrounding his trial do not reveal the existence of the chaos and subordination of the judicial process to the demands of media representatives that existed in *Sheppard v. Maxwell*. de Kaplany received a fair trial.

AFFIRMED.

WALLACE, Circuit Judge (concurring).

I concur briefly. I have no disagreement with most of my Brother Sneed's opinion; on the contrary, I join in his general analysis as well as the result. My primary exception is to the unnecessary en banc approval of our panel decision in *Sieling v. Eyman*, 478 F.2d 211 (9th Cir. 1973). Judge Sneed has called our attention to the criticism leveled at the *Sieling* decision "both for recognizing a state of semi-competence which permits a trial but denies a defendant the opportunity to plea bargain, and for providing an additional ground fraught with psychiatric uncertainties for collateral attack on guilty pleas . . . ." Majority opinion, p. 985. For those reasons, I believe *Sieling* was wrongly decided.

Since the facts of this case actually meet the more stringent test of *Sieling*, they also meet a less restrictive standard. Thus it is unnecessary and, in my judgment, improvident, to give *Sieling* en banc approval here. *See United States v. Demma*, 523 F.2d 981,

987 (9th Cir. 1975) (Wallace, J., concurring and dissenting). Since the majority has chosen to consider the continuing vitality of *Sieling*, I therefore express my view that *Sieling* should be overruled.

HUFSTEDLER, Circuit Judge, dissenting, with whom Circuit Judge ELY concurs.

My disagreement with the majority opinion stems not from its restatement of the rule of *Pate v. Robinson* (1966) 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, but from the majority's application of the rule to the facts of this case. I believe that the majority agrees that in determining whether a state trial court's failure to hold a hearing on a criminal defendant's competence to stand trial violated *Pate*, the district court in a habeas proceeding is confined to the record before the state trial court made during the course of the state criminal proceedings anteceding the petitioner's conviction and sentence, unless the trial court record is not available, accurate, or complete.[1] A hearing for the purpose of taking evidence on matters that were not before the state trial court is inappropriate; what was not before the trial court is irrelevant to the issue of whether what was before the trial court created a *Pate* doubt. Thus, testimony at the evidentiary hearing before the district court from de Kaplany's lawyer and from psychiatrists about observations and events that were not part of the record before the state trial court is irrelevant to the *Pate* issue before us.

In the state trial the evidence was not specifically focused on de Kaplany's competence to stand trial or to plead guilty.[2] Nevertheless, before the trial was over, a substantial amount of information had been generated about his competency. The evidence was conflicting. The doctors called by the prosecution testified that de Kaplany was legally sane; the defense doctors said that he was legally insane. The defense doctors' terminology for their diagnoses varied ("paranoid-schizophrenic," "multiple personality" with "acute schizophrenic reaction"), but they were in agreement that he was suffering from a serious mental disease when he committed the acts. In the course of the reports and testimony, some of the doctors referred to de Kaplany's hospitalization for mental illness in 1946, his family history of mental illness, and his suicide attempt while he was in jail awaiting trial. Dr. Shoor, a prosecution witness, observed, as did the defense doctors, that de Kaplany was obsessively suicidal, but he concluded, as did the other doctors called by the prosecution, that de Kaplany was not suffering from any gross mental disorder, that he was intelligent, alert and well oriented.

de Kaplany's demeanor during the trial varied. When the guilt phase of the trial began on January 14, 1963, he was mute, immobile and withdrawn. On the second day, the prosecution exhibited a photograph of his nude wife lying in the morgue. He jumped to his feet and lunged at the photograph shouting "No, no, what did you do to her?" He was forcibly reseated and restrained. The following day he changed his plea to guilty.

The trial court asked his defense counsel whether he had explained the nature and consequences of the change of plea to his client, and defense counsel answered affirmatively. The trial court then addressed several perfunctory questions to de Kaplany, inquiring whether he knew that he had

1. Of course, if the trial court record is deficient, an evidentiary hearing is available to cure the deficiencies. For example, the trial record may not contain reports and exhibits that were properly before the trial court and that were not introduced into evidence, or the record may not reflect the demeanor of the petitioner during the trial. An evidentiary hearing is an effective way, and sometimes the only way, to present to the district court the full picture before the trial court.

As we pointed out in *Moore*, "evidence" in the trial record "encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court." *Moore v. United States, supra,* 464 F.2d at 666.

2. None of the doctors was asked to examine de Kaplany to ascertain his competence to stand trial or to plead guilty.

been indicted for murdering his wife, whether he had discussed the matter with his counsel, and whether he fully understood the consequences of his change of plea; de Kaplany's answers are responsive but very brief: "Yes, your Honor," "Yes, I did," "I do," "That's correct," and "It is." The trial court did not pursue any further inquiry in an effort to elicit fuller responses.

There was some evidence that de Kaplany was delusional and occasionally hallucinatory. Moreover, the nature and circumstances of his killing his wife were sufficiently bizarre that an inference could be drawn that he was mentally ill, at least at that time. de Kaplany graduated from medical school in Hungary in 1951. He earned a Ph.D. in 1954. He completed his residency at Harvard University, taught anesthesiology at Yale, and was licensed to practice medicine in four states including California. On August 28, 1962, shortly after de Kaplany heard that his bride of five weeks had been unfaithful to him, he bound and gagged her, cut her with a knife, and poured nitric acid over her nude body. She survived for over a month and died from the acid burns. The commission of this grisly killing by a person highly trained in medicine strongly suggests that the perpetrator had sustained some kind of mental breakdown.

In my view, the evidence indicating doubt about de Kaplany's competence was at least as strong, if not stronger, than that in both *Pate v. Robinson, supra,* and in *Drope v. Missouri* (1975) 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103, in both of which the Supreme Court held that a competency hearing was constitutionally compelled. The record is unlike that in *Laudermilk.* (*Laudermilk v. California Department of Corrections* (9th Cir. 1971) 439 F.2d 1278; *People v. Laudermilk* (1967) 67 Cal.2d 272, 61 Cal.Rptr. 644, 431 P.2d 228.) In *Laudermilk,* all four psychiatrists concluded that Laudermilk was sane at the time of the offense, able to assist in his defense, and knew the nature and purpose of the proceedings against him. The only information arguably to the contrary was his lawyer's conclusory statement that his client could not assist in his own defense and a "psychiatric impression" by one of the psychiatrists that Laudermilk had a "paranoid personality," although he was not "overtly psychotic" and he was competent to stand trial. I agree with the *Laudermilk* courts that this evidence was too fragile to create a *Pate* doubt.

In de Kaplany's case, the expert opinion bearing on competence divided almost evenly. The majority opinion assigns no weight at all to the expert opinion that de Kaplany was overtly psychotic. It appears to assume that one set of psychiatrists' opinions demolished substantial doubt of competency created by another set of psychiatrists' opinions. In so doing, the majority improperly undertakes the role, eschewed by the California Supreme Court, of discarding expert opinion evidence "for mere psychiatric speculation clearly outside our province." (*Laudermilk v. California Department of Corrections, supra,* 61 Cal.Rptr. at 655, 431 P.2d at 239.) Moreover, it discards as readily all of the other evidence that casts doubt upon his competence.

The totality of evidence raising doubt of de Kaplany's competence was at least as substantial as the evidence tending to dispel doubt. Under these circumstances, the real doubt lingers and it could not be resolved without a *Pate* hearing both to determine de Kaplany's competence to stand trial and to plead guilty.

I would reverse for *Pate* error and remand with directions to grant the writ unless the State afforded de Kaplany a new trial within a reasonable time.