**Fred Kipp BASSETT,
Petitioner-Appellant,**

v.

**D. J. McCARTHY, Respondent-Appellee.**

No. 75–1978.

United States Court of Appeals,
Ninth Circuit.

Jan. 6, 1977.

Rehearing and Rehearing En Banc
Denied March 15, 1977.

Theodore Eugene Orliss (argued), Los Angeles, Cal., for petitioner-appellant.

John R. Gorey, Deputy Atty. Gen. (argued), Los Angeles, Cal., for respondent-appellee.

* Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

1. At the time of the trial at issue here, section 1368 provided:

   "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity."

Before HUFSTEDLER and WRIGHT, Circuit Judges, and SCHWARZER,* District Judge.

SCHWARZER, District Judge:

Petitioner sought a writ of habeas corpus in the District Court to review the failure of the state trial court to hold a hearing sua sponte on petitioner's mental competency to stand trial. Petitioner previously raised the issue on a motion for a new trial and petitions to the state appellate courts but was unsuccessful. The District Court denied the petition and we affirm.

## THE PRIOR PROCEEDINGS

Petitioner, in January 1964, was charged with two counts of first degree murder for the killing of his parents. He pleaded not guilty and not guilty by reason of insanity. Acting pursuant to Cal. Penal Code § 1368, the state trial court appointed two psychiatrists to examine him.[1] On the basis of their report, the court on February 28, 1964, found petitioner presently insane, suspended the proceedings and committed him to the Atascadero State Hospital. (Clerk's Tr. 1–4.) Some two years later, on May 4, 1966, Atascadero issued a certificate under Cal. Penal Code § 1372,[2] stating in relevant part:

"It is the consensus of the medical staff and the superintendent of the hospital that he [defendant] is now able to understand the nature of the charges against

Sections 1368 and 1372, infra, were amended in 1974, but the amendment has no bearing upon this decision.

2. Section 1372 provided at the time of defendant's certification:

   "If the defendant is received into the state hospital he must be detained there until he becomes sane. When he becomes sane, the superintendent must certify that fact to the sheriff and district attorney of the county, and the court wherein the defendant's case is pending. The sheriff must thereupon, without delay, bring the defendant from the state hospital, and place him in proper custody until he is brought to trial or judgment, as the case may be, or is legally discharged."

him and can cooperate rationally with his attorney in his defense." (Clerk's Tr. 5.)

The certificate was accompanied by a six page analytical report containing the data on which the certificate was based. (Clerk's Tr. 6–11.)

Petitioner was then returned to the Los Angeles County Jail. Trial was set for September 23, 1966 but as a result of several requests for continuances by petitioner was continued to December 1, 1966. (Clerk's Tr. 12–20.) Trial commenced that day before a jury. Under California's trifurcated procedure in capital cases, separate trials were held on the issues of guilt, sanity, and penalty. (Cal. Penal Code §§ 109, 1026.) The jury returned verdicts of guilty on both counts of first degree murder, found the petitioner to be sane and fixed the penalty at death. (Clerk's Tr. 100–102, 133–135, 146–148.)

Thereafter petitioner moved for a new trial, claiming among other things "errors in law occurring in the trial." (Clerk's Tr. 150.) In his affidavit in support of the motion, he contended for the first time that the court had committed error in having failed to order a hearing on its own motion on petitioner's present sanity. (Clerk's Tr. 152, 177–180.) Neither counsel, in the course of the brief oral argument on the motion, addressed this issue. (Trial Tr. 1809–1821.) The court denied the motion, stating in relevant part:

> "One point that was raised in the written memorandum was not discussed in the oral argument, and that is whether the Court should have had a hearing on the sanity of the defendant at the present moment and during the course of the trial. By the present moment I mean all during the course of the trial. This was a point that was not suggested to the Court by defense counsel, and the State Hospital returned the defendant to the Court as being able to comprehend the nature of the trial and to stand trial.

> I don't think the Court committed an error in not, on its own motion, raising the question of sanity of the defendant and his ability to stand trial." (Trial Tr. 1822.)

An appeal, automatic under Cal. Penal Code § 1239(b), was then taken to the California Supreme Court. The issue of petitioner's competence to stand trial, or of his sanity at the time of trial, was not raised (R. T. 15), and the Supreme Court did not mention it, except in a passing footnote reference, in its opinion. *People v. Bassett,* 69 Cal.2d 122, 70 Cal.Rptr. 193, n. 1, 443 P.2d 777 (1968). That opinion concerned itself entirely with the question of the " 'substantiality' of the prosecution's evidence of mental capacity" for the purpose of determining whether the first degree murder verdicts could stand. After a detailed review of the evidence, particularly the evidence bearing on petitioner's mental state, the court held that the judgment should be modified to second degree murder.

Subsequently petitioner sought writs of habeas corpus in the State Superior Court, the California Court of Appeal and the California Supreme Court based on the trial court's failure to hold a hearing on petitioner's competence to stand trial. All were denied on the merits without comment. The petition to the District Court followed and was also dismissed on the merits. This appeal is from the order of dismissal. We affirm.

## DISCUSSION

On this appeal we are again confronted with the troublesome question whether a state trial court denied petitioner his constitutional right to a fair trial by failing to hold a hearing sua sponte to determine petitioner's competence to stand trial. The constitutional standard of competence is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

In the present posture of the case, we are not concerned with whether the trial court could have found petitioner to be either competent or incompetent, nor are we concerned with whether this Court, viewing the matter de novo, would or should find the petitioner incompetent. The issue here is whether petitioner was denied a fair trial because he did not have a hearing on his competence to stand trial.

This Court only recently struggled with the problem of applying the principles of *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and concluded in *De Kaplany v. Enomoto*, 540 F.2d 975 (9th Cir. 1976), that due process requires the trial judge to hold a competency hearing on his own motion only where the record as a whole discloses substantial evidence sufficient to raise a genuine doubt in the mind of a reasonable trial judge concerning the defendant's competence. *Id.* at 982–983. The Court in *Drope* reminds us that this doubt relates not to mental illness in general but to the practical aspects of the defense of the action:

> ". . . the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense . ." (420 U.S. at 171, 95 S.Ct. at 903.)

This standard is not easily applied. A post-conviction claim of incompetence is likely to arise primarily in cases in which it is acknowledged that defendant suffers some mental impairment. The reviewing court must therefore sift the record of ab-

normal behavior for evidence which might, at a hearing on the issue of competence, be found to be relevant and material to competency. The difficulty of such evaluation is increased because it must be based on analysis of a trial record in which the parties presumably did not address the issue of the defendant's competency, and from which the evidence of petitioner's demeanor and attitude and of his understanding and cooperation may therefore be largely missing.

In this case the testimony disclosed that petitioner, who was eighteen at the time of the crime, had been mentally ill from early childhood (Tr. 287, 375). The expert witnesses generally agreed that he suffered from schizophrenia and, according to most, paranoid schizophrenia (Tr. 276, 136, 432, 976, 1012, 1021, 1430). His condition was accompanied by delusions and hallucinations which played a part in the crime of which he was convicted (Tr. 317–318, 326, 371).

But petitioner's mental infirmity and the bizarre crime he committed do not necessarily imply that he did not understand the proceeding or could not cooperate with his counsel.[3] See *De Kaplany v. Enomoto*, above, 540 F.2d at 982.

> ". . . [E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required . . . even one of these factors standing alone may, in some circumstances, be sufficient. There are . . no fixed or immutable signs which invari-

---

**3.** Petitioner's own expert, Dr. Richard R. Parlour, testified that paranoid schizophrenia is not a constant state which immobilizes all relevant social and intellectual functions:

> ". . . one of the remarkable things about the paranoid schizophrenia [is that] [i]t frequently affects only certain parts of the person's functioning . . . he might be able to work, and he might be able to drive a car. He might be able to do quite a few different things well; but when you get into certain areas, he's really—it's really a different story. The person doesn't have good judgment. He doesn't know the consequences of his activities. He doesn't ev· ~onsider what the con-

sequences might be. He just is acting under compulsion . . . and doesn't even think about, can't think about it and he's too obsessed with the major idea to consider the possible consequences . . ." (Tr. 1623–1624)

> ". . . the mistaken belief that he has may not affect many areas of his life . . a person can have a peculiar belief about something or other and not have it destroy his ability to work or to be friendly with some people or things like that . . . such a person [can] go about his daily affairs, that is, go to school, attend classes, and things of that sort . . ." (Tr. 1626)

ably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope v. Missouri,* above, 420 U.S. at 180, 95 S.Ct. at 908.

Unlike defendant in *Pate,* petitioner here did not have a history of irrational and violent behavior preceding the crime (383 U.S. at 379–382, 86 S.Ct. 836). See also, *Moore v. United States,* 464 F.2d 663, 665 (9th Cir. 1972). Nor was petitioner, as defendant in *Drope,* a person with a low I.Q. given to extreme anti-social conduct (420 U.S. at 164–166, 179, 181, 95 S.Ct. 896). Petitioner was obviously intelligent and articulate, a college student doing average or better work, who, as his testimony at the trial later confirmed, was able to communicate with others (Tr. 355, 525, 529–532, 536–539, 556–559). Relatives, neighbors and acquaintances testified without contradiction that his past behavior had never led them to doubt his sanity (Tr. 590, 593–595, 598, 602–603, 605–607, 1003–1004, 1010, 1501–1502, 1504–1505, 1510–1511, 1513–1515, 1520–1521, 1532–1533, 1540–1542).

Six months before the trial began, the professional staff at Atascadero had certified that petitioner was "now able to understand the nature of the charges against him and can cooperate rationally with his attorney in his defense." That certification was accompanied by a report which stated, among other things, that petitioner now understood what he had not understood when he came to Atascadero, that the killing of his parents was wrong. The report also related that petitioner

"has been doing very well the last few months, he has taken part in the ward government and has been active and helpful in our group therapy. He is the reporter for ESP and the ward. He also assists other patients with letter writing and typing help . . . The (petitioner) has been accepted as a teacher in the hospital school . . . (He) no longer hears voices and becomes much less anxious when he is around others . . .

(He) is oriented as to time, place and persons and reveals no memory defects. He is somewhat evasive and aloof. Affect is somewhat flattened. He is quite verbal, is cooperative, and understands the nature of the proceedings. He is off medication. He is mentally ill, but not to the extent that he doesn't know the nature of the charges against him. He will be able to cooperate with his attorney." (Clerk's Tr. 5–11.)

Petitioner's own expert witness, Dr. Nicholas Langer, who was the only psychiatrist who had examined him within the three month period preceding the trial, testified at the trial that "he has improved sufficiently from his severe mental illness, he had the intellectual capacity to understand what was going on and happening with him and happening around him." (Tr. 2711). Dr. Langer further testified that during the examination petitioner was "relaxed, cooperative, and was able to answer questions intelligently and fluently . . . his answers were relevant and coherent" (Tr. 273, 365–399), and he was free of delusions and hallucinations. (Tr. 353). Dr. Langer concluded that as of the time of his examination "after two and a half years of hospital care in Atascadero . . . I found . . . that the extent and acuity of his mental illness has improved noticeably." (Tr. 319, 350). There was no psychiatric evidence which indicated a doubt concerning petitioner's competency to stand trial. Compare *Tillery v. Eyman,* 492 F.2d 1056 (9th Cir. 1974).

During the trial petitioner engaged in no bizarre behavior such as defendant's attempted suicide and choking of his wife in *Drope,* and the defendant's outbursts in *De Kaplany* (540 F.2d at 978, 979). See also, *Tillery v. Eyman,* above. At no time did his mental illness appear to hamper his or his counsel's ability to present an effective (if unsuccessful) defense, as was the case, for example, in *Drope* where defendant's self-inflicted injury compelled his absence from the trial. Compare, *State v. Bauer,* 245 N.W.2d 848, 852 (Minn.1976).

Finally, in this case, as distinct from *Pate* and *Drope,* no counsel suggested or requested further inquiry into petitioner's competence after his return from Atascadero. (See 383 U.S. at 384, 86 S.Ct. 836, 420 U.S. at 177, 95 S.Ct. 896.)

That is not to say that there was no evidence which, standing alone, could have given rise to a doubt as to competency. Dr. Langer, for example, testified that when he examined petitioner in December 1966, shortly before his trial, there had been an increase in anxiety and in his schizophrenia and he concluded that petitioner was "too fragile at this time to be subjected to direct examination." (Tr. 323–324). The record shows, however, that petitioner did in fact testify for several hours both on direct and cross-examination, coherently, intelligently and without any apparent difficulty. (Tr. 1216–1423).[4] It is true that petitioner, although generally responsive, rebuffed his attorney's efforts to probe into the details of his delusions and auditory hallucinations but the questions which he resisted were questions about which even the court expressed doubt and his unwillingness to answer them does not suggest incompetence to cooperate in his defense. It is also true that, at one point, defense counsel, in explaining his manner of questioning the defendant, said to the trial judge that "throughout the entire case it's been extremely difficult for me to get information from [defendant]. Time after time I visited him down at the jail and I'd ask him questions and he would not talk to me, he would not give me any information; he would not talk." (Tr. 1358) The failure of either court or counsel to pursue this matter by raising the question of competency creates a strong inference that in context the participants in the trial viewed it as nothing more than a routine problem that counsel had been able to manage.[5]

We conclude therefore that, in the light of the record as a whole, including the prior Atascadero certification of competence, petitioner's behavior and demeanor at the trial and the absence of medical or other evidence reflecting inability on his part to comprehend the nature of the proceedings against him or to cooperate with counsel in his defense, a reasonable judge would not be expected to have experienced a genuine doubt respecting petitioner's competence, and the trial court's failure to hold a competency hearing cannot be found to have denied petitioner a fair trial.

Accordingly, the judgment dismissing the petition is affirmed.

HUFSTEDLER, Circuit Judge, dissenting:

There are differences in the details of this record, and the record in *De Kaplany v. Enomoto* (1976) 540 F.2d 975, but my conclusion is the same for the same reasons that I recited, dissenting in *De Kaplany:*

"The totality of the evidence raising doubt of [Bassett's] competence was at least as substantial as the evidence tending to dispel doubt. Under these circumstances, the real doubt lingers and it could not be resolved without a *Pate* hearing . . . to determine [his] competence to stand trial. . . ." (540 F.2d at 989).

I would reverse for *Pate* error and remand with directions to grant the writ unless the State affords Bassett a new trial within a reasonable time.

---

**4.** When asked directly whether he was aware of where he was and why he was there, petitioner responded affirmatively. (Tr. 1216).

**5.** When the court early in petitioner's direct testimony asked whether the purpose of putting him on the stand was "to demonstrate that he is not now mentally capable", defense counsel said, "No, Your Honor. It's not my purpose to determine that he is insane at this time." (Tr. 1220).