# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JASPER N. MCMURTREY, III,
            *Petitioner-Appellee,*

v.

CHARLES L. RYAN, Warden,
            *Respondent-Appellant.*

No. 03-99002

D.C. No.
CV-88-00844-TUC-
WFN

JASPER N. MCMURTREY, III,
            *Petitioner-Appellant,*

v.

CHARLES L. RYAN, Warden,
            *Respondent-Appellee.*

No. 03-99009

D.C. No.
CV-88-00844-TUC-
WFN

OPINION

Appeal from the United States District Court
for the District of Arizona
Wm. Fremming Nielsen, Senior Judge, Presiding

Argued and Submitted
March 21, 2006—San Francisco, California

Filed August 21, 2008

Before: Harry Pregerson, William A. Fletcher, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Pregerson

11215

## COUNSEL

Gregory Kuykendall, Kuykendall & Associates; Natman Schaye, Chandler & Udall, LLP, for the petitioner.

Terry Goddard, Attorney General; Kent E. Cattani, Chief Counsel, Capital Litigation Section; Patricia A. Nigro, Assistant Attorney General, Arizona Attorney General's Office, for the respondent.

## OPINION

PREGERSON, Circuit Judge:

The State of Arizona appeals the federal district court's grant of habeas corpus relief to Petitioner Jasper N.

McMurtrey, III, in this pre-AEDPA case.[1] The district court concluded that McMurtrey's due process rights were violated when the Arizona trial court failed to hold a hearing to determine whether McMurtrey was competent to stand trial, despite considerable evidence suggesting that he was not. *See Pate v. Robinson*, 383 U.S. 375, 385 (1966).[2] This violation, the court held, was not cured by a subsequent hearing. The federal district court also found that McMurtrey's trial counsel rendered ineffective assistance because his failure to renew a request for a competency hearing regarding McMurtrey's competency at the time of trial was objectively unreasonable. McMurtrey cross-appeals the federal district court's denial of nine other due process and ineffective assistance claims.

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253. For the reasons set forth below, we affirm the district court's finding that there was substantial evidence, particularly by the time of sentencing, to suggest that McMurtrey's due process rights were violated when the state trial court failed to hold

---

[1]AEDPA is the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, which altered the role of the federal habeas court in reviewing state prisoner applications brought under 28 U.S.C. § 2254. *See Bell v. Cone*, 535 U.S. 685, 693 (2002). Under AEDPA, the federal court may reject a state court's judgment only if it was "contrary to" or "involved an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). However, AEDPA does not apply to the merits of petitions filed before April 24, 1996, the effective date of the Act. *See Caswell v. Calderon*, 363 F.3d 832, 836 n.3 (9th Cir. 2004). Because McMurtrey filed his first federal habeas petition in 1988, before AEDPA's 1996 enactment, AEDPA does not affect our analysis.

[2]The purpose of a competency hearing is to determine whether the defendant is able (1) to understand the nature of the present criminal proceedings, and (2) to assist counsel in a rational manner. *People v. Masterson*, 8 Cal. 4th 965, 971 (1994); *see also Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993) ("The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the *ability* to understand the proceedings.").

a hearing to determine whether he was competent to stand trial and be sentenced. We also hold that this violation was not cured by a subsequent hearing. Because we affirm the federal district court on this ground, violation of due process, we do not reach the district court's decision on McMurtrey's claim of ineffective assistance of counsel. We also do not reach McMurtrey's cross-appeal of his nine due process and ineffective assistance claims.

## FACTUAL AND PROCEDURAL HISTORY

### I.  Factual Background

Early in the morning on August 10, 1979, McMurtrey shot and killed two men and seriously injured a third man in an incident at the Ranch House Bar in Tucson, Arizona. McMurtrey and the three victims had apparently engaged in loud conversations about their toughness and had arm-wrestled, chewed glass, and shown off their tattoos. McMurtrey eventually went out to the parking lot and obtained a revolver from an acquaintance. He then returned to the bar, approached the victims, and fired the gun until it was empty. McMurtrey fled the state. In August 1980, approximately one year later, McMurtrey was arrested in Topeka, Kansas, and returned to Arizona for prosecution in the Ranch House shooting.

### II.  Procedural History

#### A.  *State Court Proceedings*

At trial, which began in July 1981, represented by attorney Bertram Polis and his associate counsel Henri Sadacca, McMurtrey did not deny shooting the victims. Rather, McMurtrey pleaded the defenses of self-defense, lack of premeditation, and insanity. On July 13, 1981, the jury returned a verdict of guilty on two counts of premeditated first degree murder and one count of attempted first degree murder. Pima

County Superior Court Judge Jack Arnold found no mitigating factors and found that the fact that McMurtrey had created a grave risk of death to persons other than the intended victims was an aggravating factor. In August 1981, Judge Arnold sentenced McMurtrey to death for both murders and to a twenty-one-year term of imprisonment for the attempted murder conviction.

The Arizona Supreme Court affirmed the convictions and the sentence for attempted murder but vacated the death sentences, finding that the state trial court may not have considered fully all of McMurtrey's mitigation evidence. *See State v. McMurtrey*, 664 P.2d 637, 645-46 (Ariz. 1983). After a new sentencing hearing, Judge Arnold resentenced McMurtrey to death. The Arizona Supreme Court, however, again vacated the death sentence and remanded for resentencing on account of the trial court's misapplication of the "beyond a reasonable doubt" standard to McMurtrey's mitigation evidence. *See State v. McMurtrey*, 691 P.2d 1099, 1100-01 (Ariz. 1984). Judge Arnold held a third sentencing hearing and again imposed the death sentences. This time, in 1986, the Arizona Supreme Court affirmed the death sentences. *See State v. McMurtrey*, 726 P.2d 202 (Ariz. 1986).

In July 1987 McMurtrey filed a petition for Post-Conviction Relief ("PCR") and, with new counsel, an amended petition in September 1987, asserting, *inter alia*, (1) that Polis provided ineffective assistance in failing to request a timely competency hearing, and (2) that McMurtrey had been mentally incapable of assisting Polis during trial. Attached to the petition was an affidavit from Sadacca, Polis's associate counsel, stating that during the trial McMurtrey was either heavily sedated or extremely agitated. Sadacca noted that McMurtrey's alternating states of sedation and agitation made it difficult for McMurtrey (1) to assist with the preparation of his defense, and (2) to concentrate during pre-trial interviews or courtroom proceedings. On February 26, 1988, Judge Arnold denied the petition, finding that all of the issues

were barred because McMurtrey could have raised them on direct appeal or were otherwise precluded. Judge Arnold denied the request for rehearing in April 1988. In September 1988, the Arizona Supreme Court denied review.

In October 1989, McMurtrey filed a second petition for PCR in state court. McMurtrey contended that the jail's administration of medication had rendered him mentally incompetent at trial. Affidavits from McMurtrey and Polis were attached to the PCR petition. McMurtrey's affidavit stated that he had been given "heavy doses of a great variety of drugs before, during, and after" trial that prevented him from being able to think clearly or to assist in his defense. Polis's affidavit stated that he witnessed irrational displays of anger and extreme mood swings and that McMurtrey's mental state worsened as the trial proceeded. On June 20, 1990, the state trial court dismissed McMurtrey's second amended petition for PCR on procedural grounds. In April 1991, the Arizona Supreme Court denied review and in May 1991 denied McMurtrey's motion to reconsider. McMurtrey filed a third petition for PCR about victim impact statements that was denied in November 1991; review was denied in May 1992.

### B.    Federal Habeas Proceedings

McMurtrey filed a habeas petition in federal district court on December 19, 1988. The district court stayed the proceedings in September 1989 to allow him to exhaust the previously mentioned ineffective assistance of counsel and competency claims contained in his second petition for PCR in state court. In May 1991, after McMurtrey's second petition for PCR was dismissed, the federal district court lifted the stay and allowed him to file an amended habeas petition. McMurtrey filed an amended petition in August 1991 raising twenty-six claims. McMurtrey filed a second amended petition in May 1992.

Following oral argument on preclusion issues in February 1994, in March 1994 District Judge Richard M. Bilby con-

cluded that, under Arizona law, the state trial court had erroneously precluded the ineffective assistance claim raised in McMurtrey's first petition for PCR without providing an evidentiary hearing or ruling on the merits. Judge Bilby therefore stayed habeas proceedings and remanded so that the state court could address the merits of the ineffective assistance claim in McMurtrey's first petition for PCR.

In November and December 1994, Judge Arnold conducted a six-day evidentiary hearing on that and other claims. In May 1995, Judge Arnold denied relief, finding that McMurtrey had been mentally competent for trial and that the performance of McMurtrey's counsel had not been deficient. McMurtrey petitioned for review in November 1995. Again, the Arizona Supreme Court denied review of the third petition for PCR. In May 1997, the Arizona Supreme Court denied review of McMurtrey's fourth petition for PCR, filed in April 1996 and based on the use of a hypnotized witness, and denied review of Judge Arnold's evidentiary ruling.

On November 18, 1997, the federal district court lifted its stay and allowed McMurtrey to file a third amended habeas petition raising forty-three claims. McMurtrey filed a fourth petition in May 1998 enhancing one of his claims. Judge Bilby died on August 11, 1998, and the case was reassigned to Judge William F. Nielsen on September 28, 1998.[3]

In an order entered March 6, 2000, addressing McMurtrey's fourth amended petition, the federal district court ruled that portions of twenty-eight of McMurtrey's forty-four habeas claims were procedurally defaulted and that McMurtrey established neither (1) cause and prejudice, nor (2) a fundamental miscarriage of justice to excuse the defaults. The district court directed further briefing on the

---

[3]Judge Nielsen, a district judge from the Eastern District of Washington, appears to have been sitting by designation in Arizona district court when he received this case.

merits of the remaining claims, which included the claim that the state trial court erred in not ordering an evidentiary hearing on McMurtrey's competence to stand trial.

On March 4, 2003, in a thorough fifty-three-page memorandum and order, the district court granted habeas relief to McMurtrey. *McMurtrey v. Ryan*, No. 88-844 (D. Ariz. Mar. 4, 2003). The district court found that substantial evidence before the trial court "was sufficient to raise a reasonable doubt as to [McMurtrey's] competency to stand trial" such that the trial court should have ordered a hearing on the issue, a violation not cured by the 1994 hearing, and that counsel had provided ineffective assistance with respect to this issue. The district court denied the remainder of McMurtrey's guilt-phase claims, finding that they lacked merit, but did not rule on the due process challenge to the question of McMurtrey's actual incompetence. Finally, the district court denied McMurtrey's sentencing-related claims without prejudice. The court deemed its order a "conditional" writ of habeas corpus. It did not require that McMurtrey be released from custody outright; instead, by granting the petition, the district court delayed McMurtrey's release from custody for 180 days to give the State an opportunity to initiate new trial proceedings.

The State filed a timely notice of appeal, but inadvertently failed to request a stay of the judgment under Federal Rule of Civil Procedure 62. In September 2003 McMurtrey moved for a dismissal of the prosecution with prejudice or his release with conditions and pending appeal. In October 2003 the state made an untimely motion for a stay of the enforcement of the court's judgment. The district court held a hearing in December 2003 and concluded that release was appropriate. The court found that: (1) the State failed to present evidence that McMurtrey was a danger to the community; (2) the State's interests would not be harmed irreparably absent a stay; (3) the State's opening appellate brief did not demonstrate a likelihood of success; and (4) McMurtrey would suffer substantial

injury each day of continued incarceration. The district court also held that the State's inaction was not sufficient to warrant a finding that the State be barred from retrying McMurtrey. McMurtrey was released that same month.

## C.   The Appeal and Cross-Appeal

The State appeals the district court's decision, contending that: (1) the district court erred by rejecting Judge Arnold's 1994 finding that McMurtrey failed to prove that he was incompetent, and (2) McMurtrey necessarily failed to prove ineffective assistance of counsel because McMurtrey failed to prove that he was incompetent to stand trial. McMurtrey cross-appealed, presenting nine challenges to the district court's decision.

## STANDARD OF REVIEW

The district court's decision to grant or deny a 28 U.S.C. § 2254 habeas petition is reviewed *de novo. See Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir. 1999). The district court's findings of fact are reviewed for clear error. *See McClure v. Thompson*, 323 F.3d 1233, 1240 (9th Cir. 2003) (noting that the standard is "significantly deferential"). We owe less deference to state court factual findings under pre-AEDPA law, but "we must still presume such findings to be correct unless they are 'not fairly supported by the record.' " *Bean v. Calderon*, 163 F.3d 1073, 1087 (9th Cir. 1998) (quoting 28 U.S.C. § 2254(d)(8) (1996)). In contrast to cases in which a habeas petition was filed after the enactment of AEDPA, here we need not defer to state court rulings on questions of law "since the federal court is not formally reviewing a judgment, but is determining whether the prisoner is 'in custody in violation of the Constitution or laws or treaties of the United States.' " *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997) (quoting 28 U.S.C § 2254(a)).[4] That is, "we

---

[4]*See supra* note 1.

'simply resolve the legal issue on the merits, under the ordinary rules.' " *Summerlin v. Schriro*, 427 F.3d 623, 628-29 (9th Cir. 2005) (en banc) (citation omitted).

## ANALYSIS

McMurtrey claims that his procedural due process rights were violated by the state trial court's failure to conduct a competency hearing. The federal district court found that the evidence before the state trial court raised a reasonable doubt as to McMurtrey's competence to stand trial and, therefore, that the state trial court should have ordered a competency hearing.

[1] In *Pate*, the Supreme Court held that a state court must follow adequate procedures to protect against the conviction of a criminal defendant who is incompetent to stand trial. 383 U.S. at 386. "To be competent to stand trial, a defendant must demonstrate an ability 'to consult with his lawyer with a reasonable degree of rational understanding' and a 'rational as well as factual understanding of the proceedings against him.' " *Douglas v. Woodford*, 316 F.3d 1079, 1094 (9th Cir. 2003) (quoting *Godinez*, 509 U.S. at 396 (internal quotations and citation omitted)). When "the evidence raises a '*bona fide* doubt' " about the defendant's competence to stand trial, a trial judge must *sua sponte* conduct an evidentiary hearing. *Pate*, 383 U.S. at 385; *see also Odle v. Woodford*, 238 F.3d 1084, 1087 (9th Cir. 2001) (same).

Due process requires a state court to hold a hearing where substantial evidence before the court "indicate[s] the need for further inquiry" into the defendant's competency. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). Because there are no "fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed[,] the question [of competency] is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Id.*; *see also Williams v. Woodford*, 384 F.3d 567, 604 (9th

Cir. 2004) ("Although no particular facts signal a defendant's incompetence, suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and available medical evaluations of the defendant's competence to stand trial.").

In reviewing whether a state trial judge should have conducted a competency hearing, we may consider only the evidence that was before the trial judge. *See Williams v. Woodford*, 384 F.3d at 604. We therefore review the record to determine whether the evidence before the state trial court raised a "*bona fide* doubt" that McMurtrey was competent to stand trial. *See Pate*, 383 U.S. at 385; *de Kaplany v. Enomoto*, 540 F.2d 975, 979 (9th Cir. 1976) (en banc). If a reasonable judge would have had such a doubt, McMurtrey was entitled to a competency hearing, and the failure to hold such a hearing violated his right to due process. *See Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir. 1994) (superseded on other grounds by AEDPA).

For the reasons set forth below, we find that the evidence available to Judge Arnold when McMurtrey was tried and sentenced was sufficient to raise a reasonable doubt as to McMurtrey's competency to stand trial and be sentenced. Accordingly, we affirm the decision of the federal district court that McMurtrey's right to due process of law was violated by the state trial court's failure to conduct a hearing on McMurtrey's competence to stand trial.

**I.  There Was Sufficient Evidence Before the State Trial Court to Raise a Reasonable Doubt as to McMurtrey's Competency to Stand Trial**

Evidence concerning McMurtrey's competence to stand trial included evidence about McMurtrey's medications, as well as reports and testimony from doctors and prison officials presented to the trial court at relevant stages of the proceedings. We first provide an overview of the evidence before

the Arizona court pre-trial and during trial, pre-sentencing, and sentencing. We then explain why this evidence is sufficient to raise a reasonable doubt as to McMurtrey's competence.

## A.  *Evidence at Pre-Trial*

On December 9, 1980, eight months before trial, attorney Polis filed a motion for a competency examination and a hearing to determine McMurtrey's competency to stand trial under Arizona Rule of Criminal Procedure Rule 11 ("Rule 11"). Polis requested that the examination be conducted in a "hospital atmosphere" so that McMurtrey could be examined in a drug-free state and subjected to intensive psychiatric and neurological tests to determine the extent of his medical problems. The motion, which the State opposed, stated that McMurtrey could not adequately assist counsel because of McMurtrey's poor memory about the crime, the court's administration of anti-psychotic drugs, McMurtrey's history of mental health problems, and his need for medication. Attached to the motion was an excerpt of a medical report showing that McMurtrey had been admitted to the psychiatric unit of a hospital at age fifteen.

McMurtrey's motion was supported by an examination done by Dr. David Gurland, a psychiatrist retained by McMurtrey. In a letter dated November 7, 1980, Dr. Gurland noted that McMurtrey had a history of head injuries and mental health problems, along with a longstanding history of psychological problems that stemmed from unresolved issues surrounding McMurtrey's father's fatal shooting of McMurtrey's mother and her lover when McMurtrey was seven years old. Dr. Gurland opined that McMurtrey, who began suffering seizures as an adolescent, had a "marginal" adjustment to high school, "with a schizoid personality." Dr. Gurland also expressed concern about the effects of McMurtrey's numerous motorcycle accidents, which had caused head trauma. Dr. Gurland questioned the Pima County

Prison's decision to prescribe Thorazine and Atarax, concluding that the medications, while in some cases capable of providing effective treatment for seizures and anxiety, were potentially harmful to McMurtrey's damaged liver. Dr. Gurland stated that, because of McMurtrey's mental health issues, he did not believe that McMurtrey understood at the time of the crime the difference between right and wrong or the significance of the Ranch House Bar incident. He described McMurtrey's mental state as fragile and was concerned that, with the stress of the upcoming trial, McMurtrey's mental state would deteriorate further without proper medication. Dr. Gurland recommended that McMurtrey be hospitalized as soon as possible so that he could receive appropriate medication, have his seizure history evaluated, have an EEG and a CAT scan because of the seizures, and receive tests to investigate the functioning of his liver. He concluded that a Rule 11 exam was warranted.

Superior Court Judge William Druke, who handled such motions, took the competency examination motion under advisement and ordered Polis to arrange for McMurtrey to be examined by the Court Clinic to determine if reasonable grounds existed to hold a Rule 11 evaluation. As a result, court psychologist Cynthia Ginnetti met with McMurtrey on January 13, 1981. In a letter to the court, Dr. Ginnetti stated that McMurtrey "demonstrate[d] a good understanding of the charges against him and of the legal process generally." However, Dr. Ginnetti expressed concern over McMurtrey's "spotty" memory about the crime, noting that "this does impair his ability to assist counsel, particularly if a defense of self-defense is pursued." Dr. Ginnetti recommended EEG testing to check for temporal lobe damage.

Polis hired psychiatrist Leonardo Garcia-Bunuel to meet with McMurtrey in January 1981 and review his records. McMurtrey told Dr. Garcia-Bunuel that he had "experienc[ed] auditory and visual hallucinations since age fifteen." When asked about the incident at the Ranch House Bar, McMurtrey

stated that he remembered men at the bar threatening to slice the "one percent" tattoo off of his arm.[5] McMurtrey recalled that the men grabbed him and that McMurtrey had pulled a gun on the men. He remembered seeing himself shoot the gun, as though he were a bystander, unable to do anything. On several occasions during the interview, McMurtrey rocked back and forth in his chair. Dr. Garcia-Bunuel noted that such behavior is a common side effect of certain drugs like Atarax and Thorazine, and that he, like Dr. Gurland, questioned whether McMurtrey should be receiving those medications.

To determine if McMurtrey was faking some of his symptoms, Dr. Garcia-Bunuel led him into some "traps." The doctor reported that McMurtrey did not fall victim to any of them. In fact, Dr. Garcia-Bunuel stated that he felt "very strongly" that McMurtrey "is not faking in any way, that he is, and has been, honest throughout." Dr. Garcia-Bunuel concurred in Dr. Gurland's evaluation and recommended that McMurtrey undergo a complete neurological evaluation, including EEG testing, a brain scan, and a skull examination.

Based on these reports, Polis filed a motion requesting a neurological examination, which Judge Druke granted. The tests revealed no abnormalities. On February 4, 1981, neurologist Harvey Buchsbaum met with McMurtrey. In a letter to the Pima Deputy County Attorney, Dr. Buchsbaum discounted any concerns of significant neurological damage, concluding that the tests revealed no evidence of neurological disease and that McMurtrey's action in the bar "fits better with a rage attack instead of a psychomotor seizure." After reviewing Dr. Buchsbaum's report, Judge Druke decided that there was no need to do anything further, and no testimony

---

[5]As the district court noted, the term "one percenter" is usually associated with membership in the Hell's Angels motorcycle gang, and the name is derived from a statement issued by the American Motorcycle Association that ninety-nine percent of motorcyclists are good people enjoying a clean sport and that one percent are outlaw bikers.

was taken. At Polis's urging, the court agreed to review the reports offered by the defense, but on February 20, 1981, Judge Druke stated that he was "unable to find reasonable grounds to believe the defendant is incompetent to stand trial" and summarily denied the Rule 11 motion and referred the case back to Judge Arnold.

On March 6, 1981, Dr. Gurland wrote to Polis to inform him that McMurtrey had been moved to the psychiatric unit of a local hospital because of "suicidal ideation and a psychotic breakdown."[6] Dr. Gurland stated that McMurtrey was experiencing memory and anxiety problems and that, as a result, McMurtrey was incompetent to stand trial. He further noted that McMurtrey was able to understand and follow the court proceedings, and would "not be incompetent in those areas." Dr. Gurland recommended that McMurtrey receive Valium to alleviate his "high anxiety level." The same month, Dr. Gurland again examined McMurtrey. Dr. Gurland diagnosed McMurtrey as exhibiting mixed neuroses, depression, and anxiety, and noted that stress was the major factor triggering McMurtrey's mental health problems.

On March 13, 1981, four months prior to trial, McMurtrey was examined for an hour by Dr. John LaWall, the State's primary psychological expert in this case. McMurtrey told Dr. LaWall that he had suffered auditory and visual hallucinations since the age of fifteen and that he had been hospitalized for these hallucinations. McMurtrey also explained that he occasionally saw people and weapons that were not really there and that since age fifteen he has experienced blackouts— "periods in which he loses touch with his surroundings but apparently does not lose motor control." McMurtrey admitted that he had used drugs in the past, including amphetamines and LSD, but told Dr. LaWall that his current illicit drug use was minimal. McMurtrey told Dr. LaWall about his motorcy-

---

[6]The record does not reveal whether Polis submitted this letter to the trial court.

cling and his affiliation with the "one percenters." McMurtrey mentioned that he was a frequent visitor to the Ranch House Bar and that, although he had a dim recollection of the events of August 10, 1979, which Dr. LaWall termed "partial alleged amnesia," McMurtrey did remember drinking approximately a fifth of whisky and possibly taking a barbiturate. Dr. LaWall noted that McMurtrey was taking Dilantin,[7] Elavil,[8] and Librium.[9]

Based on his one-hour interview with McMurtrey, and a review of the reports discussed above, Dr. LaWall found it "difficult to diagnose any mental disorder." He concluded that McMurtrey "was oriented to time, place and person," that he did not suffer from epilepsy or partial seizures, but that, in his opinion, "[t]here are a number of elements in his history which tend to suggest a variety of disorders" and that McMurtrey might suffer from "atypical dissociative disorder." He thought that at the time of the crimes McMurtrey understood his actions and the difference between right and wrong. Finally, Dr. LaWall stated that, in his opinion, McMurtrey was competent to stand trial because he was capable of understanding the nature of the proceedings and because he was able to assist in his own defense.

---

[7]Dilantin is an anti-epileptic drug used to treat grand mal seizures. *See* Dilantin, Physician's Desk Reference website, *available at* http://www.pdrhealth.com. The side effects of Dilantin may include decreased coordination, involuntary eye movement, mental confusion, and slurred speech. *Id.*

[8]Elavil, an antidepressant, was prescribed by Dr. Santiago, who treated McMurtrey when he was hospitalized. Patients taking Elavil may experience drowsiness, dizziness, blurred vision, sedation, and confusion. *See* Elavil, Physician's Desk Reference website, *available at* http://www.pdrhealth.com.

[9]Librium is a sedative used to treat anxiety. *See* Physician's Desk Reference 3299 (2008). It may interfere with mental alertness and cause drowsiness, confusion, and nausea. *Id.*

## B.   Evidence at Trial

The record shows that, during McMurtrey's trial, which began on July 1, 1981, and lasted for seven days, McMurtrey was ill on at least three occasions. On the third day of trial, attorney Polis complained to the court that McMurtrey's medication was responsible for McMurtrey "getting ill constantly in the courtroom." Judge Arnold called for a recess on account of the nausea. Polis also alerted the court to McMurtrey's nausea on each of the final two days of the trial.

At trial, Dr. LaWall and Dr. Gurland testified as to their March examinations of McMurtrey. Dr. Gurland, who examined McMurtrey in November 1980 and again in March 1981, testified that McMurtrey was treated with Thorazine. He called Thorazine "a major tranquilizer," "used for more significant degrees of agitation or emotional upset." Dr. Gurland testified that he was uncertain how long McMurtrey had been receiving Thorazine, but that he believed that McMurtrey had been medicated with it by jail physicians "for some time." Dr. Gurland noted that in November 1980 McMurtrey was taking approximately double the recommended dosage of Thorazine; he stated that the average person "would be laid out for the next seven or eight hours" if given such a dose. Dr. Gurland also noted that McMurtrey had been prescribed Dilantin, Elavil, Atarax, and Librium during his incarceration. Dr. Gurland testified that the amount of Librium prescribed to McMurtrey "was five times the addictive dose."[10]

Dr. José Santiago, who treated McMurtrey during his one-week hospitalization, testified about McMurtrey's current mental state to provide corroborative evidence in support of McMurtrey's defense that the shooting was a product of his chronic insanity or mental illness. He diagnosed McMurtrey

---

[10]As for Dr. Gurland's March 6, 1981, letter discussing McMurtrey's one-week hospitalization, it is unclear from the record whether Polis submitted this letter to the court.

as suffering from, among other conditions, a major depressive disorder that impaired his ability to control his emotions. Dr. Santiago explained his diagnosis as follows:

> Well, what I mean is that because of the illness, because of the difficulty with the emotions, the patient is unable to interpret what he sees and what happens around him in a logical, coherent fashion. Now remember that I made that observation in connection with a thought disorder. Mr. McMurtrey does not have a thought disorder, so he is able to, in essence, process the cues around him. In the emotional disorder which is what Mr. McMurtrey has, what he is unable to control is his emotions and his emotions[,] in turn, impair gravely on his ability to function when he is under that particular acute phase of the illness.

Dr. Santiago stated that fear and "stress will provoke a major depressive disorder episode" and that McMurtrey's mood disorder was evidence of mental illness. He further noted that some people who suffer from a depressive disorder may not know right from wrong. When pushed by the prosecutor to express his opinion whether McMurtrey was sane on the night of the incident, Dr. Santiago stated, "If you want me to hypothesize, the fact that [McMurtrey] has a mental illness would support the possibility that he might be insane at the time of the offense." Dr. Santiago described the medications administered to McMurtrey while in jail, which included Thorazine, an anti-psychotic drug, Dalmane, which he called a "sedative hypnotic drug,"[11] and Chloral Hydrate, a sedative. He also described the medications administered during McMurtrey's hospitalization, which included Thorazine and Elavil, an antidepressant.

---

[11]Dalmane is used as a hypnotic agent to treat insomnia. *See* Physician's Desk Reference 3285 (2008). It can interfere with mental alertness and cause dizziness, drowsiness, nausea, nervousness, irritability, slurred speech, restlessness, and hallucinations. *Id.*

### C. *Evidence in Pre-Sentencing Report*

Before sentencing, the state trial court's probation department obtained information concerning McMurtrey's incarceration at the county jail. A form[12] completed by a nurse indicated that McMurtrey was taking Phenobarbital, Dalmane, and Ativan.[13] The court also received various incident reports from corrections officers. These incident reports indicated that between January and July 1981, McMurtrey set fires, passed out, threw food, fought with other inmates, and assaulted a corrections officer. Jail personnel modified or reduced his medications before McMurtrey was seen by a doctor. McMurtrey also injured himself on three separate occasions. On February 26, 1981, he was found in his cell with blood dripping from his arms and a pool of blood at his feet. Shortly thereafter, McMurtrey was hospitalized. On July 16, 1981, three days after being convicted, McMurtrey smashed his head against a window. Nine days later, on July 25, 1981, he smashed his head against a door.

The probation department also referred McMurtrey to psychiatric social worker Carolyn Ford, who examined

---

[12]This form is all that is available because McMurtrey's jail medical records and medical administration chart were apparently destroyed. The jail progress notes described in Part II of the opinion were not presented to the trial court until the 1994 evidentiary hearing. Accordingly, they are not relevant to the consideration of whether a competency hearing should have been conducted. *See Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir. 2004).

[13]Ativan is used to treat short term anxiety disorders. *See* Ativan, Physician's Desk Reference website, *available at* http://www.pdrhealth.com. It may cause dizziness, memory problems, sedation, transient amnesia, unsteadiness, and weakness, and it is not recommended if "full mental alertness" is required. *Id.* The drug's description warns that it is "especially important" to check with a doctor before combining Ativan with other sedative-type medications, such as Valium. *Id.* McMurtrey was prescribed as much as twelve milligrams in one day, in excess of the two to six milligram recommended dosage. An overdose of Ativan may result in confusion, drowsiness, low blood pressure, and sluggishness. *Id.*

McMurtrey on July 28, 1981. According to Ford's evaluation, McMurtrey spoke in an "extremely loud, rambling, tangential, at times philosophical, and at times, crude manner," and his behavior was "highly agitated and impulsive," interspersed with periods during which he appeared to be sleepy. Ford was not able to evaluate credibly McMurtrey because she found that his behavior was "purposefully manipulative and cunning, designed to intimidate, harass, and in general keep people away from him."

Prior to sentencing, McMurtrey moved for a new trial. In the motion, he argued that the change in his medication during trial prevented him from receiving a fair trial. Specifically, the motion stated:

> As the evidence adduced at his trial demonstrates, Mr. McMurtrey had severe mental health problems. These problems were aggravated during times of stress, and were treated by psychoactive drugs during the entire time of his incarceration and trial. These drugs included Thorazine, Ativan, Valium, Elavil, Dilantin as well as others. In the middle of trial Mr. McMurtrey's medication was changed and his already unstable mental health further declined. This additional instability, occasioned by the change in medication, in turn adversely affected his demeanor at trial until, on the last day, he was essentially on the verge of a nervous breakdown. This change in demeanor, it is Mr. McMurtrey's contention, operated to deny him a fair trial as Constitutionally guaranteed because the jury viewed a man in "a chemical straight jacket."

The trial judge denied the motion in a two-page minute order.

### D. *Evidence at Sentencing*

On August 28, 1981, the day of sentencing, attorney Polis drew the court's attention to McMurtrey's one-page patient order sheet that listed the variety and quantity of drugs prescribed to McMurtrey before and during the trial. This patient order sheet made clear that, during trial, McMurtrey was prescribed Valium,[14] Ativan, Librium, and Dalmane.[15] The following conversation took place between the court and attorney Polis:

> Judge: What import does the medical records and change in medication have on the defense's position in this case? You see, it puts me sort of at a disadvantage to have this handed to me the day of sentencing.
>
> Polis: I understand that. Just makes the record complete with respect to what medication he received in the jail and the changes in it. If the Court would review that, you would see —
>
> Judge: I'm not a doctor. I really wouldn't know what it meant if I reviewed it. A change in medication means nothing without some sort of expert to testify as to what effect, if any, it would have

---

[14]Valium is used to treat anxiety disorders. *See* Physician's Desk Reference at 2765. Use of Valium may cause drowsiness, fatigue, confusion, depression, blurred vision, and rage, and may interfere with mental alertness. *Id.*

[15]These four medications are classified as benzodiazepines, a family of psychoactive compounds used to treat anti-anxiety disorders. *See* Stedman's Medical Dictionary 198 (26th ed. 1995). Benzodiazepines are highly addictive drugs that commonly interfere with memory, ability to concentrate, and intellectual function.

on the defendant's position. All I can say [is] I observed Mr. McMurtrey all during the course of the trial and the only opinion I have is that he didn't appear to be under the influence of any drugs to the extent that it would deprive him of his ability to be aware of what was going on.

At the end of the sentencing hearing, the following exchange took place:

Judge:          Mr. McMurtrey, I haven't heard from you in regard to the position you are in. Do you have anything to say to the Court before sentence is imposed?

McMurtrey:   Sir, I don't know if I'm speaking to the Court when I speak, but I would like to speak to the Creator, the Creator of this court and the Holy Creator, would that be all right?

Judge:          I talk to Him all the time. So you go right ahead.

McMurtrey:   (Kneeling.) Sir, I'm speaking to You in a voice at this time because I have others around me that need to know my thoughts. I ask that You give them the wisdom to make Your correct decision and the rest of us the strength to hold that wisdom. Amen.

                That is all I have sir.

The court then denied McMurtrey's motion for post-trial relief. In its minute order, the court stated: "The Court feels

that there is no evidence whatsoever that Mr. McMurtrey's medical treatment at the jail had any effect on his ability to defend himself. The Court observed Mr. McMurtrey during the trial; he appeared alert and in control of himself . . . ." Judge Arnold then sentenced McMurtrey to death plus twenty-one years.

### E. Analysis

We agree with the district court that the evidence before the state trial court regarding McMurtrey's behavior, medications, and memory problems was sufficient to raise a reasonable doubt as to McMurtrey's ability to assist counsel, despite Dr. LaWall's testimony to the contrary. *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972) (holding that records showing defendant's history of mental illness and instability raised reasonable doubt even though psychiatric report before his guilty plea found him competent); *see also Torres v. Prunty*, 223 F.3d 1103, 1110 (9th Cir. 2000):

> In the face of this evidence, and under the *Pate* standard for triggering a competency hearing, the modest evidence of [the defendant's] competence does not fairly support the trial court's conclusion that no hearing was required. [A doctor's] previous conclusion that [the defendant] was competent to stand trial does not obviate the need for a hearing. Nor does the evidence that [the defendant] was able to assist his attorney at trial in minor ways.

**[2]** The state trial court had before it a significant body of evidence that McMurtrey received a wide variety of anti-psychotic and anti-anxiety medications over the course of his incarceration. By the time of sentencing, Judge Arnold had been presented with evidence that McMurtrey was prescribed Atarax, Ativan, Chloral Hydrate, Dalmane, Dilantin, Elavil, Librium, Thorazine, and Valium. This evidence came in the form of pre-trial reports from doctors, trial testimony, docu-

ments in the pre-sentence report, and documents attached to the motion for a new trial. The medications alone should have raised concerns for Judge Arnold. *See Moran v. Godinez*, 972 F.2d 263, 265 (9th Cir. 1992), *overruled on other grounds*, 509 U.S. 389 (1993) (holding that the trial court's failure to inquire about the four psychiatric medications defendant was taking, among other factors, raised reasonable doubt about competence); *Miles v. Stainer*, 108 F.3d 1109, 1112 (9th Cir. 1997) (finding that state court's failure to ask defendant whether he had been taking his psychotropic medication before accepting his guilty plea raised reasonable doubt about defendant's competence to plead guilty, and therefore competency hearing should have been held). When presented with the evidence regarding McMurtrey's medications at sentencing, however, Judge Arnold simply noted that he was not a doctor and that, as such, he could not evaluate what the effects of the medications might have been.[16]

[3] Other evidence presented at trial raised further doubts about McMurtrey's competence. The district court summarized some of this evidence as follows:

> The [state trial court] learned during trial that McMurtrey was prescribed a variety of anti-anxiety medications, had been hospitalized for a suicide attempt, and suffered from a major depressive disorder that impaired his ability to control emotions. The court also observed McMurtrey become repeatedly physically ill during trial and, prior to sentencing, received documentation of McMurtrey's increasingly volatile and aggressive behavior in jail. The

---

[16]The State notes that, with the exception of a one-page record, there is no way to know all of the medications that were actually prescribed and in what dosages they were administered to McMurtrey. Certainly, a more complete record regarding the dosages administered and their effect on McMurtrey would be enlightening. As the district court noted, however, "due in part to the trial court's refusal to hold a post-trial hearing on competency, a more complete record does not exist."

court was aware of counsel's concern that McMurtrey was on the verge of a nervous breakdown and operating in a "chemical straight jacket," as well as medical records documenting Valium injections during trial to treat "extreme agitation." Finally, the court observed McMurtrey at sentencing as he knelt to address the "Creator of this court" and requested a "correct decision" without providing any coherent statement concerning himself, the crime or sentence.

We agree with the district court that this evidence raised a reasonable doubt as to McMurtrey's competence. The jail incident reports presented to Judge Arnold in the presentence report illustrating McMurtrey's increasingly erratic and volatile behavior were striking, especially alongside evidence that McMurtrey was prescribed substantial doses of powerful and potentially incompatible medication.

**[4]** We also agree with the district court that Dr. LaWall's pre-trial evaluation of McMurtrey is not dispositive evidence that McMurtrey was competent at the time of trial. Dr. LaWall met with McMurtrey for one hour in March 1981. His observations from a brief interview conducted four months before trial cannot overcome a reasonable doubt concerning defendant's competence to stand trial. *See Moore*, 464 F.2d at 666 ("Once there is [evidence raising a reasonable doubt as to the competency to stand trial] from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence."). Further, as the Supreme Court noted in *Drope*, 420 U.S. at 181, "Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." Judge Arnold's responsibility to be alert for changing conditions is especially strong because the court was on notice from Dr. Gurland that the stress brought about by trial might cause McMurtrey's mental state to further deteriorate.

The time lag between Dr. LaWall's examination and trial is also particularly important because McMurtrey does not allege a longstanding mental disease, but instead argues that medications prescribed by prison medical personnel temporarily undermined his competency.

Finally, Dr. LaWall's conclusions are weakened because they did not reflect consideration of the effect that McMurtrey's medications would have on his competence to stand trial. *See Moran*, 972 F.2d at 268 (noting that expert's report was "all the weaker as an indication of [the petitioner's] competency to waive his constitutional rights because it says nothing about the effects of any medication").

**[5]** In sum, Dr. LaWall's testimony did not overcome the other evidence in the record about McMurtrey's competence. McMurtrey's due process rights were therefore violated. *See James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992) (noting that "the trial of an incompetent defendant is per se prejudicial"). We therefore affirm the district court's conclusion that because a bona fide doubt existed as to McMurtrey's competence to stand trial and be sentenced, a competency hearing should have been conducted.

## II. The State Trial Court's Failure to Hold a Timely Competency Hearing Is Not Cured by the 1994 Evidentiary Hearing

The State relies on Judge Arnold's finding, after the 1994 evidentiary hearing, that McMurtrey failed to prove that he was not competent to stand trial. As noted earlier, the 1994 hearing was conducted after the federal district court concluded that Judge Arnold had erroneously precluded McMurtrey's ineffective assistance claim raised in his first petition for PCR. At that hearing, McMurtrey argued (1) that there had been a reasonable doubt as to his competency at trial, and (2) that his counsel was ineffective for failing to reassert the competency issue during trial.

## A.  Evidence Presented at the 1994 Hearing

At the 1994 evidentiary hearing, McMurtrey presented the testimony of attorney Polis, attorney Sadacca, psychologist Dr. Joseph Geffen, jail guard Jeff Rogers, newspaper reporters Ben McNitt and Deborah Wyermann, and substance abuse expert Dr. Andrew Weil, as well as jail progress notes for the trial days. The state presented testimony from prosecutor Jim Himelic, detective Leo Duffner, Dr. LaWall, and psychologist Dr. Alexander Don.

### 1.   Bertram Polis

Polis, who met with McMurtrey dozens of times prior to trial, testified that McMurtrey's behavior was very inconsistent and that he was sometimes "uncommunicative." One month before trial, when Polis informed McMurtrey of the State's plea offer of twenty-one years for second degree murder, McMurtrey stated that he would plead guilty only to "poaching out of season." Polis stated that he did not believe that McMurtrey thought clearly about the plea offer or considered it in a rational fashion.

Polis testified that, as the trial approached, McMurtrey's mental state "deteriorated from the time of trial and continued to deteriorate throughout the trial." He testified that McMurtrey's demeanor fluctuated greatly during the trial, that McMurtrey was often agitated, angry, uncommunicative, and emotionally unstable, and that he had little memory of the offense. Polis also testified that McMurtrey interfered with his representation during trial, making verbal comments and threats, writing illegible notes, whispering, and mumbling. "It got to the point where I was more controlling Mr. McMurtrey than I was having him assist me." Polis saw McMurtrey receive medication during recesses throughout the trial and saw him get sick from them.

Polis also met with McMurtrey after trial and sentencing when McMurtrey had been moved to a new prison. Polis testi-

fied that McMurtrey "was like a different person" who was "mentally stable," "calm," and "exhibited some clarity of thought that I had never seen before in him."

### 2. Henri Sadacca

Sadacca testified that he met with McMurtrey often prior to trial, during trial, and throughout sentencing. In Sadacca's view, McMurtrey's conduct was very inconsistent. According to him, as the trial approached, McMurtrey's behavior became more extreme, and he often appeared "very agitated," "volatile," or "heavily sedated." Sadacca also stated that McMurtrey often made strange and inappropriate comments. Throughout the trial, Sadacca witnessed jail personnel—not medical professionals—administer medication to McMurtrey while in the courtroom. Sadacca testified that he believed that it was the medication, particularly the differing varieties and quantities, that contributed to McMurtrey's "radical difference" in and "roller-coaster" behavior and his "slurred" speech. Sadacca also testified that McMurtrey's state prevented him from assisting in his own defense and that he believed that McMurtrey's medications interfered with McMurtrey's ability to communicate with counsel.

### 3. Dr. Joseph Geffen

Dr. Joseph Geffen, who examined McMurtrey in 1992, was asked to review McMurtrey's jail records from early 1981 through August 1981. Reviewing all of the data, including the reports by various experts and doctors, relevant court records, and McMurtrey's statements of former drug and alcohol abuse, Dr. Geffen found that the evidence suggested that McMurtrey was not competent at the time of trial. "I think that there's a lot of supportive data that I reviewed . . . that would indicate that he may not have been competent, that he probably wasn't at the time, at the time of trial." When asked specifically whether there was "a reasonable question as to whether or not Mr. McMurtrey was or was not competent at

the time of his trial," Dr. Geffen said, "Yes, I believe that there was." Without having examined McMurtrey in 1981, Dr. Geffen acknowledged that he could not state conclusively whether McMurtrey was, in fact, competent during trial. He also stated that he would have thought there was a reasonable doubt even based on the materials available at the time of trial, without the benefit of the subsequent information.

Dr. Geffen also described the difference between McMurtrey as described in 1981 and when he saw him in 1992. Dr. Geffen found the difference to be "striking."

> I would say yes, that there was a striking difference between my impressions and the picture that I had built up prior to my seeing Mr. McMurtrey based on the — not only on the reports of all the doctors who examined him, but also including the mental health records of the jail, and some of the minute entries about his behavior, and then what I saw in 1992.
>
> The difference I think would tend to support the view of his having been quite dysfunctional and quite distant, his behavior having been quite problematic, psychologically, at the time, because when I saw him several years later, he had been free of drugs, he had not had any medication, any psychotropic medications, he had not had any street drugs; his mind was clear.

Dr. Geffen went on to state that "McMurtrey was ashamed — that he felt ashamed of himself that he had actually avoided dealing with his trial and that he had engaged in taking so many drugs and substances which resulted in his not being able to be aware of what was going on and his not being able to assist better."

### 4.  Jeff Rogers

Jeff Rogers was employed by the Pima County Sheriff's Department as a corrections officer from November 1979

through August 1981. Rogers readily recalled McMurtrey because they interacted every day. Rogers testified that McMurtrey's behavior was erratic and that he often moved around in what the guards characterized as a "Thorazine shuffle." Rogers explained that this was not a medical diagnosis, but a colloquial term referring to McMurtrey's "shuffling walk," "glazed eyes," and being "not very alert." As time passed, McMurtrey's "stupor state" became more common, and by summer (and the trial), McMurtrey was in a stupor two thirds of the time that Rogers saw him. Rogers believed that McMurtrey received medication about three times a day because Rogers often accompanied the jail nurse as she dispensed medicine to each inmate.

### 5. Ben McNitt

Ben McNitt, a former Tucson Citizen reporter, covered parts of McMurtrey's trial for the newspaper. McNitt testified that he spoke to McMurtrey on the phone and that although he tried to probe McMurtrey for his feelings about the incident and the victims, McMurtrey "seemed emotionally disengaged" and unable to offer "a normal emotional response on any level." McNitt had spoken to hundreds of criminal defendants during his ten years as a reporter in Arizona, but he found McMurtrey's level of "detachment" unusual. The only time that McNitt saw McMurtrey speak in person was at the sentencing hearing. McNitt explained his impression of McMurtrey's behavior in the courtroom as follows: "I have a very clear recollection that my first impression was that he appeared glazed. His eyes appeared glazed. Almost like someone who had just, you know, you just wake up and are still sort of partly asleep."

### 6. Deborah Wyermann

Deborah Wyermann, a reporter for the Arizona Daily Star from 1978 to 1986, covered McMurtrey's trial for the newspaper. She could not remember much of the trial but testified

that the sentencing was the "most bizarre" of the more than 150 sentencing hearings she had seen. Wyermann stated that she had a good view of McMurtrey and that she could see and hear him very clearly.

> Well, Mr. McMurtrey appeared to me to be — to not exactly know where he was, and in addition, . . . he was erratic in both his body movements and his speech. His eyes were unfocused and glazed, and his voice was loud. Sometimes loud, sometimes soft, and then, to my way of thinking, a lot of what he said was fairly incoherent.

Wyermann also recalled the "spectacle" in which McMurtrey knelt and asked to speak to the Creator.

### 7. Dr. Andrew Weil

Dr. Andrew Weil, an expert in substance abuse and addiction, reviewed McMurtrey's medical records for June 29 to July 13, 1981. Dr. Weil noted that a number of the medications prescribed to McMurtrey — Valium, Dalmane, Librium, and Ativan — are "benzodiazepines within a subdivision of drugs called sedative hypnotic drugs." Dr. Weil testified that these drugs are used either as nighttime sedatives or daytime anti-anxiety medications. He noted that these drugs are highly addictive and that they commonly "interfere with memory, ability to concentrate, and with intellectual function." Dr. Weil admitted that the effects varied from patient to patient but stated that "it's constant enough to be a major problem." Dr. Weil testified that these drugs are problematic because they are among the most commonly prescribed medications and because of the "percentage of people who get them who suffer mental problems as a result of taking them." Dr. Weil also stated that combining the drugs, in the manner prescribed to McMurtrey, is an additional danger.

### 8.   Jail Progress Notes

The jail's progress notes reflected McMurtrey's erratic behavior as trial approached. In April 1981, he experienced balance problems and fell several times in his cell and once in the courtroom, which one of his doctors suggested was caused by overmedication. In June 1981, McMurtrey complained that he could not sleep because of his anxiety about the trial, and that he was so upset that he wanted to put "[his] thumb in someone's eye." The notes from July 2, 1981, the second day of trial, reflect that McMurtrey was very agitated, "tearful one moment then violent the next." On July 7, 1981, a nurse noted that the trial judge "wished to have the doctor in jail to review the chart in reference to [McMurtrey's] complaints of stomach pain, constipation and nervous condition." McMurtrey was administered 10-milligram Valium injections on July 10 and 11 and was again prescribed Ativan and Dalmane by July 13 as well as Valium. Finally, on July 16, McMurtrey intentionally crashed his head through the window-portion of a jail door.

### 9.   Jim Himelic

Jim Himelic prosecuted the case. He stated that he did not observe McMurtrey throughout the trial but instead looked at him "every once in a while like you do any trial." Himelic stated that he could not recall "seeing anything out of the ordinary during the trial on [McMurtrey's] part." He testified that he never saw a deputy give McMurtrey medication and that he did not recall seeing McMurtrey drowsy or asleep at the counsel table. When asked if he remembered McMurtrey saying anything during closing arguments, Himelic stated, "I don't remember. On that one I'm not saying he didn't. I just don't remember."

### 10.   Lt. Leo Duffner

Lt. Leo Duffner of the Pima County Sheriff's Department served as Himelic's lead detective during the trial. Lt. Duffner

recalled that McMurtrey put his head down on the table when McMurtrey's father testified. He also stated that on several occasions he saw McMurtrey write notes to his attorneys. Lt. Duffner testified that he did not see McMurtrey receive any medication in the courtroom.

### 11.  Dr. John LaWall

Dr. LaWall was the only expert to testify at the 1994 hearing who had examined McMurtrey prior to trial. At the hearing, Dr. LaWall reiterated his earlier opinion that McMurtrey had been competent to stand trial. He noted that the surviving medical records did not indicate whether most of the medications prescribed were actually taken by McMurtrey.

Dr. LaWall stated that high doses of the drugs prescribed to McMurtrey could "produce cognitive impairment, memory impairment, poor concentration, and so on." He stated that the medications could have a "less predictable" effect on a volatile person. Dr. LaWall also noted that several of the doses prescribed in the jail medical records were "unusual" and that Elavil and Librium combined "would produce greater sedation than either one taken alone." In his view, "[i]t would be inappropriate . . . for a person to be taking more than one of these particular drugs at the same time," and that prescribing Valium, Dalmane, and Ativan simultaneously was not "rational pharmacology."

Like the other experts who testified, Dr. LaWall reviewed police reports, transcripts, and medical records to assess McMurtrey's competency at the time of trial. Dr. LaWall stated that he relied on information provided by the police and on testimony by McMurtrey only if it did not tend to be exculpatory and discredited statements made by McMurtrey's counsel about McMurtrey's appearance and ability to assist with his defense: "You know, I don't care what his counsel says. His counsel can say anything." Finally, Dr. LaWall stated that it would have been "easier" to determine

McMurtrey's competency at trial if he had examined McMurtrey closer to the date of trial. He conceded that the drugs prescribed to McMurtrey could have rendered him mentally incompetent, even if McMurtrey was not mentally ill, but that after March, Dr. LaWall did not examine him again until after the trial in August, "and there was no way for me to know what exactly he was taking at that time."

### 12.  Dr. Alexander Don

Dr. Alexander Don testified that a "competency determination or incompetency determination is a here-and-now event." He went on to explain that it is "virtually impossible to make any intelligent assessment of someone's competency after . . . such a long period of time has elapsed." Dr. Don did note that if medications had been administered to McMurtrey, they may have aided his competency by reducing anxiety and agitation.

### B.  Analysis

After the 1994 hearing, Judge Arnold concluded that "during all phases of trial and sentencing procedures in this case [ ] Mr. McMurtrey was competent." As we explain below, we affirm the district court's finding that, given the passage of time, the lack of medical records, and the absence of a doctor who assessed McMurtrey at the time of trial, a sufficiently meaningful assessment of McMurtrey's competency at trial was not possible in 1994 to cure the failure to make such an assessment at the time of trial.

[6] In *Moran*, 57 F.3d at 696, this court described the framework with which we evaluate retrospective competency hearings:

> When a state court wrongfully fails to hold a competency hearing, "it often may be impossible to repair the damage retrospectively." *Evans v. Raines*, 800

F.2d 884, 888 (9th Cir. 1986). However, although retrospective competency hearings are disfavored, *see Drope*, [420 U.S. at 183]; *Blazak v. Ricketts*, 1 F.3d 891, 894 n.3 (9th Cir. 1993) . . . , they are permissible whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant. *See Evans*, 800 F.2d at 888; [*de Kaplany*, 540 F.2d at 986]. While the passage of time is significant in determining whether such a hearing can be held, *Pate*, 383 U.S. at 387, medical reports contemporaneous to the time of the initial hearing greatly increase the chance for an accurate retrospective evaluation of a defendant's competence. *See Sieling v. Eyman*, 478 F.2d 211, 215-16 (9th Cir. 1973). *See also Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988).

Under *Moran*, the two major factors we consider are the passage of time and the availability of medical reports contemporaneous to the time of the initial hearing. Both here weigh in McMurtrey's favor. We also note that the Tenth Circuit set out a helpful framework. *See United States v. Collins*, 430 F.3d 1260, 1267 (10th Cir. 2005).

*Pate* itself illustrated an example of a retrospective competency determination that was inadequate. There, the Supreme Court highlighted several difficulties in conducting a retrospective competency hearing. This court summarized these problems in noting that the Court in *Pate*

reasoned that the inability of the jury to observe the demeanor of the accused, the fact that expert testimony would have had to have been based solely on the printed record, and the six-year lapse between the time of trial and the proposed post-conviction hearing combined to compromise such a hearing beyond redemption.

*de Kaplany*, 540 F.2d at 986 n.11. The Supreme Court and this circuit have also found retrospective competency hearings lacking or impossible on other occasions. *See, e.g.*, *Drope*, 420 U.S. at 183; *Dusky v. United States*, 362 U.S. 402, 403 (1960); *Tillery v. Eyman*, 492 F.2d 1056, 1059 (9th Cir. 1974); *Moore*, 464 F.2d 666-67.

**[7]** In this case, the evidentiary hearing occurred thirteen years after McMurtrey's trial. When the case first returned to the trial court, the trial judge refused to hold a hearing, stating:

> The Court further finds that if the Federal Courts want to intervene in this matter, they can proceed with the evidentiary hearing. I already ruled in 1988 six years ago on the matter . . . this Court saw [McMurtrey], the jury saw him all the time throughout the case. But he wasn't insane, he wasn't under the influence of drugs during the trial. The record is clear.

**[8]** Judge Arnold later changed his mind and scheduled an evidentiary hearing. The absence of relevant and potentially dispositive evidence, however, was apparent. Both parties conceded that McMurtrey's medical records were incomplete and that there was no evidence to show which of the prescribed medications were actually administered. Further, no mental health expert examined McMurtrey immediately prior to the trial or during the trial, and so there are no contemporaneous medical opinions regarding McMurtrey's competency. Even Judge Arnold conceded that "of course this case is so old, I don't remember a lot of things."

**[9]** We therefore conclude that because of the thirteen-year delay, the lack of contemporaneous medical opinions, and the lack of medical records, the state trial court could not in 1994 meaningfully determine whether McMurtrey had been competent at trial in 1981. Consequently, we find that the 1994 evi-

dentiary hearing did not cure the state trial court's failure to hold a timely competency hearing.

## CONCLUSION

We hold that McMurtrey's memory problems, his erratic behavior, and the variety and quantity of medications that he was prescribed, combined with the absence of an expert evaluation made at the time of trial, created a reasonable doubt as to McMurtrey's mental competence to stand trial. The state trial court's failure to conduct a competency hearing at that time violated McMurtrey's due process rights. The retrospective competency hearing held thirteen years after trial was insufficient to cure this due process violation. Accordingly, we AFFIRM the district court's decision to grant McMurtrey's habeas petition on this ground. Because this issue is dispositive, we need not address the remaining issues on appeal or on cross-appeal.

**AFFIRMED.**